UNITED STATES v. GRIFFITH AMUSE-
MENT CO. et al.
Civil Action No. 172.

District Court, W. D. Oklahoma.
Oct. 9, 1946.

Robert L. Wright, Milton A. Kallis, and
Posey T. Kime, Sp. Assts. to Atty. Gen.
(Wendell Berge, Asst. Atty. Gen., Walter
W. K. Bennett, Sp. Asst. to Atty. Gen., and

Charles E. Dierker, U. S. Atty., and John A. Brett, Asst. U. S. Atty., both of Oklahoma City, Okl., on the brief), for plaintiff.

Henry S. Griffing, Charles B. Cochran, and John B. Dudley, all of Oklahoma City, Okl., and L. M. Rice, of Dallas, Tex., for defendants.

VAUGHT, District Judge.

On April 28, 1939, the United States of America filed its complaint against the defendants Griffith Amusement Company, Consolidated Theatres, Inc., R. E. Griffith Theatres, Inc., Westex Theatres, Inc., L. C. Griffith, H. J. Griffith, R. E. Griffith, Paramount Pictures, Inc., Metro-Goldwyn-Mayer Distributing Corporation of Texas, Loew's Incorporated, RKO Radio Pictures, Inc., Vitagraph, Inc., Universal Film Exchanges, Inc., Twentieth Century-Fox Film Corporation, Twentieth Century-Fox Film Corporation of Texas, United Artists Corporation, and Columbia Pictures Corporation, alleging violations of Sections 1 and 2 of Title 15 U.S.C.A., the Sherman Anti-Trust Act, and seeking relief under Section 4 thereof. Prior to the trial of the cause, the action was dismissed as to all of the defendants except Griffith Amusement Company, Consolidated Theatres, Inc., R. E. Griffith Theatres, Inc., Westex Theatres, Inc., L. C. Griffith, H. J. Griffith and R. E. Griffith. Defendant R. E. Griffith died in 1943 and the action was not revived against his personal representative or his estate.

On motion of the plaintiff, paragraphs 44 to 48, inclusive, were stricken from the complaint leaving paragraphs 39, 40, 41, 42, 43, 49 and 50, which charge violations of the Sherman Anti-Trust Act. All of the defendants remaining in the case are what are known in the moving picture industry as exhibitors. The alleged violations follow:

"39. For the past five years the defendant exhibitors have *continuously combined with each other and with each of the defendant distributors to unreasonably restrain interstate trade* and *commerce* in motion picture films and to *monopolize* and *attempt to monopolize* the *first* and *second run exhibition of feature pictures* and the *operation* of *first and second run theatres* in the Griffith Towns in violation of Sections 1 and 2 of the Sherman Act, in the following manner:

"40. Said exhibitors have *refrained* from *competing with* each other in the *acquisition* and *operation* of motion picture theatres in said towns pursuant to *express or implied* agreements to allocate said territory between them.

"41. During each of the past five years said exhibitors have *collectively contracted* with each of the *defendant distributors* for all of the feature pictures annually *required for exhibition* at all of the theatres operated by them in said towns, in *advance* of the *production* and *distribution* of such feature pictures and *before* such feature pictures or any of them, have been *offered* to any *other* exhibitor in said towns, with the *purpose* and *effect* of *controlling* and *monopolizing* the *supply* of feature pictures available for exhibition in said towns.

"42. By said contracts said exhibitors have *combined* with each other to *compel each of the defendant distributors* to *grant* to all of them in all of said towns the following *exclusive privileges* during the entire time they have operated theatres in said towns: (a) The *exclusive* privilege of selecting from the feature pictures released by said distributors such feature pictures as said exhibitors deemed suitable for exhibition in said towns, as and when prints thereof became available, before said pictures were released to any other exhibitors in said towns. (b) The *exclusive privilege* of receiving clearance on said feature pictures over competing theatres in said towns.

"43. The foregoing exclusive privileges have enabled the defendant exhibitors to *unreasonably restrain, suppress* and *entirely eliminate the competition offered* by *other* theatre operators in said towns in the *licensing* and *exhibition* of feature pictures by: (a) *Preventing* them from *obtaining enough first-class pictures* for *exhibition* on *any run* to operate their theatres successfully. (b) *Forcing* them to maintain admission prices *higher* than those warranted by the quality of the entertainment they were able to offer; that is, feature pictures previously exhibited or rejected by the de-

fendant exhibitors. (c) *Preventing* them from showing any feature pictures released by the defendant distributors with first-run clearance in any of said towns. (d) *Preventing* them from exhibiting any feature pictures released by the defendant distributors with second-run clearance in any of said towns where any of the defendant exhibitors operate one or more second-run theatres."

"49. Each of the defendant exhibitors is what is commonly referred to in the motion picture industry as a circuit of theatres. As a result of the acquisition and operation of numerous theatres as hereinbefore alleged, the said exhibitors and each of them have obtained what is commonly referred to in the motion picture industry as *circuit buying power*. Said circuit buying power has *enabled* them and each of them to *obtain* the *exclusive privileges hereinbefore recited* from the defendant distributors. Said circuit buying power has *further enabled* them and each of them to *demand* and *receive* from *all distributors* of motion pictures *more favorable rental terms* in licensing their motion pictures than can be obtained by competing individual exhibitors.

"50. Said *circuit buying power* is now so great that its continued existence will tend to *subject* competing exhibitors in the Griffith Towns to *other and additional restraints* in violation of the Sherman Act, even if the foregoing restraints are enjoined, unless said circuit buying power is eliminated."

The defendants deny generally these allegations and upon the issues thus joined the cause was tried to the court.

The record is quite voluminous, containing close to 4,000 pages of testimony and many hundreds of exhibits, and exhaustive briefs were filed, which necessitate a much more lengthy opinion than in ordinary cases.

The production, distribution and exhibition of moving picture films comprise an industry that has arisen and developed during the past thirty years. In order that we may better understand the situation here, as it has been developed in the trial, it is appropriate to give a brief resume of the background of the development of the industry as it pertains to the defendants, as disclosed by the testimony.

During the thirty-year period immediately preceding the filing of the complaint in this cause, the motion picture industry has undergone marvelous changes and development.

These changes have been very marked not only in the production and distribution of pictures, but also in the exhibition of pictures. The showhouse or theater in the smaller towns and in many of the larger ones, at the beginning of this period, consisted ordinarily of a remodeled storeroom equipped, often poorly, for exhibition purposes. Those originally engaged in the exhibition of pictures were persons of little or no experience in the business and usually their methods were as crude and inefficient as the houses in which they operated. The production of better and more attractive pictures called for more efficient methods in their exhibition. All of these developments have required substantial capital for the construction of modern theaters, installation of sound equipment, more efficient personnel, and advertising and exhibiting the production.

In many of the situations in the territory in question, the pioneer exhibitors have been slow to respond to the public demand for better showhouses, modern equipment and efficient service in the exhibition of pictures. This very positive progress in the development of the business not only has made the well-managed theater a good business proposition, but has resulted in an increased interest in the business by a more progressive element, willing to provide the capital and more efficient service to meet the public demand. In reviewing the evidence, the situations will be treated individually in order to determine whether or not the existing conditions are the natural and logical result of the gradual changes suggested by the demands of the public and the opportunities from a business standpoint, and will be considered only as affecting the territory involved in this action.

The testimony discloses that the moving picture industry, as it pertained to the exhibition of pictures, from its early in-

ception until about 1928 or 1929 consisted of the exhibition of what is known as "silent films." During this period, very little effort was made by the exhibitors to construct showhouses or theaters adequate to accommodate the public. The accommodations were unsanitary, poorly planned and constructed, and were known throughout the industry as the "storehouse type" of theater. Particularly was this true as to the states of Oklahoma, New Mexico and the outlying districts of Texas. In the principal cities in Texas, however, many modern theater buildings were constructed. In 1928 or 1929 what is known as "sound equipment" was perfected and since that time we have had what is termed "talking pictures." The cost of the construction and equipment of a modern de luxe type of theater with sound equipment and a seating capacity of 600 to 1,000 was approximately $75,000. The successful installation of sound equipment in old buildings that had been converted into theaters necessitated much and expensive remodelling, at an approximate cost of $14,000. Stages in such buildings had to be reconstructed, ceilings raised or lowered, obstructions that would interfere with sound removed.

As the moving picture industry was so developing, the nation was experiencing what has been termed the "depression," with which all are familiar. Every line of business suffered and there were many failures due entirely to the depression. In order to supply the patronizing public with adequate and comfortable showhouses or theaters, those engaged in the business who kept abreast of the steady and continuing progress and scientific development of the industry sought to provide such houses of entertainment, until today there is scarcely a town of 3500 population that does not have at least one or more modern theater buildings.

Three of the defendants, R. E. Griffith, L. C. Griffith and H. J. Griffith (hereinafter referred to as the Griffith brothers), lived in the state of Texas. From 1915 to 1919, R. E. Griffith and L. C. Griffith were engaged as traveling salesmen for various distributors selling moving picture films to theater operators, except for about one year during the first World War when L.

C. Griffith served as a soldier in the United States Army. As they traveled in the states of Texas, Oklahoma and New Mexico, they grew familiar with the theater situations throughout that territory. They became interested in the exhibition branch of the industry and acquired a lease on a building in San Marcos, Texas, and remodelled it into a theater. From that time forward their interest increased and from time to time they acquired, in whole or in part, other theaters. They financed these enterprises from what they could save from their salaries, supplemented with earnings from their ventures. The two brothers came to Oklahoma City, Oklahoma, in December, 1919. At that time they had acquired an interest in the "film exchange" industry with W. G. Underwood of Dallas, Texas. They organized such an exchange business in Oklahoma City under the firm name of Oklahoma Specialty Film Exchange. This organization dealt in and distributed what was then known as "state rights" pictures and was a Griffith brothers enterprise. In this line of endeavor the two brothers traveled extensively throughout the state of Oklahoma and became familiar with the theater situation in the various towns and cities. They conceived the idea of establishing modern theaters with modern equipment in various towns, as opportunities presented. In 1924 or 1925 they acquired the Rialto theater in Oklahoma City and placed their younger brother, H. J. Griffith, in charge of it as operator, where he continued until 1926. During this time each brother developed certain individual qualities for business as he became better acquainted with the industry. R. E. Griffith grew skillful in buying and booking films for theaters, an increasingly technical and difficult task. L. C. Griffith developed as an executive. H. J. Griffith became proficient in handling the problems involved in keeping the machinery in operating condition, and the buildings properly lighted, ventilated, equipped and repaired. They possessed in common the ability to recognize and appraise conditions in the industry. Up to 1926 they had worked together as a partnership and had acquired theaters and interests in theaters in several towns

and cities. They were handicapped for finances in their endeavor to extend their holdings. An opportunity presented itself in 1926 which they believed would provide them with sufficient capital to carry out their desires of expansion. Consideration of this opportunity resulted in a contract with the Universal Chain Theatrical Enterprises, by the terms of which the Griffith brothers were to organize a corporation to be known as the Griffith Amusement Company. The Universal Chain was to own a series of Class B stock in Griffith Amusement Company and was from time to time to furnish funds to the new organization as loans with interest at ten per cent. per annum, for the purpose of acquiring theaters. The Griffith brothers were to have the actual management of the Griffith Amusement Company and the final decision relative to the acquisition of theaters. L. C. Griffith became president of the corporation and still retains that office. R. E. Griffith continued as buyer and booker of films and H. J. Griffith continued in the capacity heretofore outlined. At the time of the organization of Griffith Amusement Company, the Griffith brothers owned fifteen theaters in various places in the territory, most of which were of the storehouse type. The contract with the Universal Chain continued in force and effect until sometime in 1928 when difficulty was encountered by Griffith Amusement Company in procuring advancement of funds from the Universal Chain, and the contract was terminated. The stock owned by the Universal Chain in the Griffith Amusement Company was purchased by the Griffith brothers.

Some of the stockholders of Griffith Amusement Company did not endorse the acquisition of additional theaters and the Griffith brothers organized another corporation, the Consolidated Theaters, Inc., and later changed to Griffith Consolidated Theatres, Inc. The latter corporation acquired theaters as advantageous opportunities permitted. L. C. Griffith later became president of Consolidated Theaters, Inc., and that organization occupied the same offices as Griffith Amusement Company, with the same clerical force and with one overhead expense.

Griffith Amusement Company organized a department to furnish administrative services to theaters throughout the territory, including those of Consolidated Theatres, Inc. It furnished such services as the buying and booking of films, bookkeeping and auditing services, an auto trailer pick-up service to deliver film reels, and various other services valuable to theater operators, at a fee of four per cent. of the annual gross receipts, under what were called administrative contracts.

In acquiring an interest less than the full ownership of a theater, the purchase contract provided that the Griffith interest would have "exclusive charge of the buying and booking of films."

In the purchase of a theater, the contract usually provided that the seller would not engage in the theater business, directly or indirectly, in that community for a specified period of time, as a part of the consideration for the purchase of the "good will" of the seller.

In 1931, R. E. Griffith left the organizations as a regular salaried employee of Griffith Amusement Company and was never thereafter employed by Griffith Amusement Company or Consolidated Theatres, Inc., except as follows: Neither L. C. Griffith nor H. J. Griffith had acquired sufficient experience in buying and booking films to carry on such work successfully for their theaters. The corporations then employed R. E. Griffith to buy and book films for the theaters in which they were interested until the 1938–1939 season, when his services as such were discontinued. In the meantime, H. R. Falls assisted R. E. Griffith in such service until 1938 when Falls assumed such duties for Griffith Amusement Company and Consolidated. From 1938 until his death in 1943, R. E. Griffith was in no way connected with buying and booking films for the two corporations.

At the time R. E. Griffith severed his connection with the organization in 1931, he exchanged his stock in Consolidated Theatres for three theaters owned by that corporation in New Mexico, but retained his stock in Griffith Amusement Company. He removed to New Mexico and formed

two organizations through which he conducted the same character of business. One was incorporated December 23, 1931, as R. E. Griffith Theatres, Inc., and the other was incorporated March 27, 1936, as Westex Theatres, Inc.

The Griffith brothers are shown to have been exceptionally good theater operators, keeping constantly abreast of the development of a rapidly growing industry. Their accounts naturally were coveted by the producers and distributors of moving pictures.

The contentions of the Government, as stated in its brief, are: "that the defendants secured through acquisition of financial interests in competing theatres and by management agreements with them, a film purchasing power far greater than that possessed by any of its local competitors;" "that this power was used to secure contracts for exhibition rights to the films of the major distributors which gave the defendants an unreasonable control over the licensing of such film to others in numerous towns in the states mentioned;" "that this control was used to absorb or otherwise eliminate a number of actual and potential competitors;" and, "that the acquisition of such power by concerted action, apart from its illegal use, constitutes a violation of the Sherman Act." The Government insists that the evidence justifies the conclusion as a matter of law that these contentions are sound, and stresses in its brief twenty-five theater situations to sustain its position. These situations are taken up in detail in the findings of fact filed herein.

There are three parties involved in the industry in the exhibition of moving picture films—the producer, the distributor and the exhibitor. The producer and the distributor are closely allied, so much so that they are frequently one institution with two departments. The distributor has to rely upon the producer for product. The producer has to rely upon the distributor for the exploitation of the product. The production of moving picture films entails the expenditure of vast sums of money to meet weekly payrolls, et cetera. It is the function and business of the distributor to contact the exhibitors throughout the territory where they desire to exhibit the films.

In doing this, the distributor is concerned in securing the best returns for the product he can obtain that will insure a steady income to keep the industry moving. The exhibitor is interested in buying the product at the lowest possible cost and in keeping a steady flow of the product for his theater, or theaters, of the kind and character he desires, at the times and places he desires to exhibit.

The product is copyrighted and is not sold to the exhibitor but is licensed to him for exhibition under certain terms and conditions. This practice has developed what is termed in the industry the "standard form" of contract, the provisions of which control except where they conflict with provisions in the "master" or basic contract. The evidence clearly discloses that the distributor selects his own customers and accounts and the exhibitor has no control over that phase of the industry. Many things are taken into consideration by the distributor in making that selection, such as the ability of the exhibitor to exploit the films in his community, his experience in exhibiting moving picture films, the facilities of his theater, his ability to pay for the product, and his integrity or lack of integrity.

In the development of the trade in the industry, the distributor endeavored to have his exhibitor license the product for a year in a contract called a season contract. The solicitation began about the latter part of July or the first of August in each year. At that time the distributor had determined the kind and character of product he would be able to supply the exhibitor for that season. In most instances, the films had not yet been produced and no one knew how successful they would prove as box-office attractions, and in the season contract the exhibitor would be accorded the privilege of rejecting or eliminating a certain per cent. of the product during the season. Later, and during the time covered by the complaint, the distributor conceived the idea of licensing the product for a longer term than one season, and entered into a contract to license its product for a two, three or five-year period, which was called a franchise. This proved not to be advantageous to the distributor and has

been discontinued by practically all of them. At the time the contracts were entered into between the distributors and the exhibitors, the terms and conditions were arrived at by "barter and trade."

Griffith Amusement Company, Consolidated Theatres, Inc., and the theaters with whom they had administrative contracts negotiated the licensing of films through R. E. Griffith, as their representative, until the 1938-1939 season. At the beginning of the season, as a matter of convenience, R. E. Griffith would go to the New York offices of the various major distributors, as it was the rule that all licensing contracts were required to have the approval of the New York office. There he would enter into negotiations with each distributor separately for the licensing of such of the output of films on hand, or to be produced, as he deemed would insure a supply which would reasonably meet the needs of the various towns in which they were to be exhibited, at the times they were needed. Such negotiations called for considerable ability and skill, and frequently took weeks to conclude. The negotiations with each distributor would be reduced to a memorandum agreement and later covered by a contract for each theater. These contracts always provided that the exhibition of the films was to be governed by the general provisions of the standard form of contract unless it was provided otherwise in the memorandum agreement.

Beginning with the 1938-1939 season, the negotiating for the licensing of films was done by H. R. Falls, as representative, and in much the same manner as theretofore except as to the place of negotiation. Instead of Falls going to New York, the representatives, or the state or district managers, of the distributors carried on their negotiations with Falls either in Oklahoma City, Oklahoma, or Dallas, Texas.

The evidence discloses that in all the contracts with exhibitors, the films were licensed either at a "flat rental" price or on a "percentage" basis. The contracts of the defendants Griffith Amusement Company, Consolidated Theatres, R. E. Griffith Theatres and Westex Theatres are practically all on a flat rental basis, although there are some percentage deals. The competitors of the defendants, aside from those with whom there were administrative contracts, were inclined more often to deal on a percentage basis. On the flat rental basis the exhibitor took a chance that he might lose on the deal, while on the percentage basis such chance was negligible. The testimony of all the major distributors is that in licensing the films, the Griffith theaters were treated the same as any other exhibitor.

As the industry developed the distributors began to license their films to be run for a second, third or even greater number of exhibitions, in towns and cities where they deemed it to be profitable. This caused some exhibitors to operate theaters for the exhibition of such runs almost exclusively. Such theaters are designated as second and third-run theaters. The second and third-run theaters supplement their product frequently by licensing films produced by other than the major producers, which are called "independents." The distributors alone determined in what localities second and third runs should be licensed and how much time should elapse between the first exhibition of a film and the second and succeeding runs of it.

All of the defendants, except R. E. Griffith who is dead, together with their representatives who took part in and concluded the negotiations for licensing product with the distributors covering the period of time set out in the complaint, have testified that they had no agreement or understanding with such distributors to in any manner control the exhibition of moving picture films in the various towns and theaters. They further testify that what was, or was not, to be licensed to their competitors in the various situations was never discussed or taken into consideration in such negotiations. Their testimony is corroborated by the representatives of the distributors who were present and negotiating with them in the licensing of product. There is no evidence to the contrary. The representatives of the distributors who took part in these negotiations testify that the buying power of the defendants was not considered the controlling factor in their negotiations, and some of them specify towns in the territory where

they have never licensed their product first, second or third run to the defendants but have always licensed the product to their competitors.

The defendants further testify that they did not combine or conspire to unreasonably restrain trade in the moving picture films, or to stifle competition in the product, or to create a monopoly in it in the various situations in which they exhibited the films.

This brings us squarely to the consideration of the following propositions and the law as declared by our courts governing such situations.

1. Are the acts and conduct of the defendants, as shown by the evidence, in the acquisition and operation of their theaters in connection with their buying power, and the provisions of their contracts with distributors, such as to justify the inference that a conspiracy or combination exists upon the part of the defendants to control the exhibition of moving picture films, or to unreasonably restrain trade in such product, or to stifle competition in such product, or to create a monopoly in the exhibition of moving picture films in the towns in the territory covered by the complaint, in violation of the Sherman Act?

2. If the court would be justified in concluding that such an inference could be drawn, would the court be further justified in concluding that such inference should control over the positive and direct testimony of the witnesses to the contrary?

3. Is buying power alone, resulting from thrift, fair dealing and industry, sufficient to justify the inference that a combination or conspiracy exists for the purpose of, and is being used in negotiations to, unreasonably restrain trade, stifle competition, or create a monopoly in a given product, or must it be established by a fair preponderance of the evidence that a combination or conspiracy exists and has for its purpose the use of such buying power to obtain those specific results?

In considering the first proposition it may be necessary to repeat statements contained in our preliminary discussion.

Section 1, Title 15 U.S.C.A., provides, so far as it pertains to the case at bar, as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * *."

Section 2 provides in part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

The Government contends that the defendants have by their acts and conduct in the territory and during the time set forth in its complaint violated the provisions of these sections. The Government assumes that the defendants were acting in unison and in a cohesive combination in their theater operations. The evidence does not sustain this contention.

The undisputed testimony is that the defendants, L. C. Griffith, R. E. Griffith and H. J. Griffith, operated as a partnership in the business of acquiring, operating and developing theaters until sometime in 1926. There was nothing unlawful or unreasonable in that line of endeavor and they are not charged with any irregular conduct in it. In 1926 they incorporated their business as Griffith Amusement Company. Since that time, the acts of the brothers were those of officers of corporate bodies and not those of individuals, except the services performed by R. E. Griffith as buyer and booker of films. In 1928 another corporation was organized by these brothers, known as Consolidated Theatres, Inc. While the evidence discloses that these two corporations maintain their offices at the same place, it also shows that they are distinct entities and have had nothing in common with each other aside from the fact that since their organization, both have engaged in the exhibition of moving picture films. The uncontradicted evidence is that in 1931, R. E. Griffith severed his business connection with both Griffith Amusement Company and Consolidated Theatres and has had nothing to do with the business policies or operation of those two organizations since that time aside from serving

them as agent and representative in purchasing and booking films for a consideration agreeable to the parties, until the season of 1938-1939 when he ceased to function in that capacity.

Neither Griffith Amusement Company nor Consolidated Theatres had any control of any character over the operations of R. E. Griffith Theatres, Inc., or Westex Theatres, Inc. Nor did R. E. Griffith Theatres, Inc., or Westex Theatres, Inc., have any control of any character over the operations of Griffith Amusement Company or Consolidated Theatres, Inc., during the time covered by the complaint, but each has been, and was at the time of this trial, a distinct entity from the date of its organization.

The Government contends that the four corporation defendants were combined into one circuit of theaters and refers to it as "the Circuit." The evidence does not so disclose. It does disclose that each corporate defendant owned and operated a distinct circuit or chain of theaters.

The business or industry in which these defendants are engaged is competitive in many places. We are not concerned with those towns where there was no competition at the time of the filing of this complaint except any incidental bearing it might have upon competitive situations during the time covered by the complaint. "Competition," it has been said, "is the life of trade." The very law we have under consideration, the Sherman Act, has for its purpose the protection of competition. The law in every conceivable way has always favored it, when fairly conducted.

In Sinclair Refining Co. v. Federal Trade Commission, 7 Cir., 276 F. 686, 688, the court said:

"Competition is not an unmixed good. It is a battle for something that only one can get; one competitor must necessarily lose. The weapons in competition are various. Superior energy, more extensive advertising, better articles, better terms as to time of delivery, place of delivery, time of credit, interest or no interest, freights, methods of packing, lower prices, more attractive and more convenient packages, superior service, and many others, are and always have been considered proper weapons. Expense attending the use of any weapon, the foolishness of it, the fact that a method is uneconomical, or that the competitor cannot meet any method or scheme of competition because it will be ruinous to him to do so, have not, nor has either of them, ever been held unfair. Such things are a part of the strife inherent in competition. * * *"

If the battle of competition is carried to its normal conclusion one competitor reaches a point of ascendency over the other, and the losing competitor naturally takes a secondary position or is completely vanquished. They both cannot occupy the same position in the contest at the same time. It is a competitive contest and there is no rule of law, economics, or business that can strike and maintain an even balance between the participants during its progress. In the business in which the individual defendants were engaged, the exhibition of moving picture films, both competitors could not exhibit the same picture at the same time. The licensing of the film was the business of the distributor, and his choice of who should exhibit it and the terms and conditions under which he would license the film were matters that were wholly in his control. The distributor either had the film or was going to produce it; it was his article and was for license. The market was provided by the distributor; the various exhibitors knew where and from whom the article was to be licensed. The methods of the distributor were known to all. The evidence shows that the exhibitor either could go to headquarters direct and bargain or could wait for some representative to call on him and bargain through the representative. If the exhibitor was content to wait for the representative, or depend upon correspondence, he took his chances on supply. If upon the other hand he cared to go to headquarters and bargain, it was possible to get a better choice of product, just as it is in any other line of endeavor where one is engaged in retailing to the trade goods that are provided by wholesale dealers.

The evidence discloses that the defendants took advantage of the opportunities

afforded them in the ordinary course of dealing during the time covered by the complaint. That was their privilege and there was nothing illegal or immoral about it, merely because they represented large interests or were able to make large deals. The evidence shows that the licensing was all arrived at by barter and trade, and the exhibitors all placed upon the same footing.

The attitude of the Government is one of suspicion. Many of the normal and natural occurrences and situations are given a sinister meaning and argued from that standpoint. The proposition of what "could be done" or "might be done" under given situations is argued vigorously. But we are not concerned with that approach. Our concern is what the evidence discloses *was done,* and any fair inferences we can gather from those acts regarding the *intent* of those who acted. A fair indication of this attitude can be gathered from the Government's brief (p. 14) which states:

"The ability of the defendant to withdraw from a particular major distributor the entire revenue from its closed towns was of course a major threat it possessed. When this is controlled by one individual negotiating with a distributor its effect is self evident."

The evidence fails to disclose that any threat was so made by R. E. Griffith or any other defendant in the negotiations for films, but to the contrary. The suggestion that any distributor on account of that ability was intimidated or compelled to sell films to the defendants is not supported by the evidence. If the mere ability to withdraw all purchases from a distributor in noncompetitive situations, unless the purchaser grants favors in competitive situations, is a threat then all exhibitors possessing two theaters, one in a competitive situation and one in a noncompetitive situation, violate the Sherman Act. Such argument is unsound and falls of its own weight.

The Government contends that: "Section 1 of the Sherman Act was violated by unreasonable restraints on the interstate distribution of motion pictures resulting from: (a) each of the master deals and franchises between a distributor and the Griffith Circuit; (b) each of the agreements between exhibitors for collective licensing; (c) each of the agreements between exhibitors by which one agreed not to compete with the other either by a pooling arrangement or by a sale of goodwill, and (d) unreasonable restraints resulting from implied agreements between defendants and distributors." These contentions will be considered in order.

The Government assumes a state of facts not supported by the evidence. There are no master deals or franchises between any distributor and the "Griffith Circuit" shown in the evidence. The master deals and franchises in their final analysis are between a distributor and each of the four corporate defendants, or between a distributor and some individual exhibitor who is not a party defendant here. They are separate deals negotiated by an agent for the exhibitors upon the one hand and the various distributors individually upon the other hand. There is no evidence that there was any agreement, conspiracy or combination between the negotiators of the deals that had for its object granting to the defendant exhibitors any advantage or concession for the purpose of stifling competition, monopolizing the industry, or occasioning or bringing about any unreasonable restraint in trade in the product in such territory. The undisputed testimony is that such matters were never at any time discussed between the parties.

The master deals consist of either a memorandum agreement at the close of the negotiations signed by the parties, or in some instances, a letter from one party setting forth the terms and accepted by letter by the other party. Later these were approved by the proper officials of the distributors, which were followed by contracts embodying the agreement with the individual theater exhibitor. There is nothing in the evidence that indicates anything abnormal or unusual in these agreements.

As to the franchises, the evidence is that prior to the time covered by the complaint, the distributors conceived the idea of licensing their films for a longer period than one season. They sought out the exhibitors and endeavored to license them for a term

of years, which resulted in contracts that were called franchises. They not only sought out the exhibitor operating a circuit of theaters, but also the exhibitor operating one theater. Such licensing became a part of the ordinary method and many operators of theaters had franchises for a term of two, three, and even five years. Later most of the distributors concluded that in practical operation, a franchise was not desirable and discontinued the practice.

That such franchises were considered as a part of the ordinary method of contracting for moving picture films by all the trade is borne out by Section IV of the Consent Decree which provides: "The provisions of this decree shall not apply to any franchise which was signed prior to June 6, 1940."

The evidence discloses that the defendants entered into four of such franchise contracts. One executed May 8, 1930, for a term of five years, between Metro-Goldwyn-Mayer Distributing Corporation (now Loew's) and Griffith Amusement Company, Consolidated Theatres, Inc., and two other corporations not party defendants here. It was amended as to Griffith Amusement Company and Consolidated on April 20, 1933. At the time of the filing of the complaint it had practically one year to run. It was not renewed. One executed September 15, 1934, for a term of three years, between Paramount Pictures Distributing Company and Griffith Amusement Company, R. E. Griffith Theatres, Inc., Consolidated Theatres and fifteen other organizations not parties to this action, all represented by R. E. Griffith, agent for such parties. This franchise was not renewed. One executed March 19, 1935, for a term of three years between RKO Distributing Corporation and Griffith Amusement Company, R. E. Griffith Theatres, Consolidated Theatres and five other organizations not parties to this action, all represented by R. E. Griffith, as agent. This franchise was not renewed. One executed September 14, 1937, for a term of three years between Columbia Pictures Corporation and Consolidated Theatres, R. E. Griffith Theatres, Griffith Amusement Company and Westex Theatres, by R. E. Griffith, "authorized agent." This was not renewed.

During the time covered by the complaint, the defendants did not have franchises in effect with more than two distributors during any season. The franchises with Loew's (MGM) and Paramount were in effect during the 1934–1935 season. The franchises of Paramount and RKO were in effect in the 1935–1936 and 1936–1937 seasons. Franchises were in effect with RKO for the 1937–1938 season, and with Columbia for the 1938–1939 and 1939–1940 seasons. Thus at least six of what is termed the major distributors had no franchises with the defendants during any season covered by the complaint. In view of that situation we fail to see how the franchises held by the defendants could seriously restrain commerce in the films. Certainly they did not unreasonably restrain it, regardless of any of the provisions in the franchises that appear upon their face.

But counsel for the Government insist there are provisions in those franchises that would justify the conclusion that special privileges were given to the defendants, and that by reason thereof, it can be inferred that some kind of an agreement or conspiracy was in effect between the parties to the franchise to restrain commerce, control product or monopolize.

Those provisions have been carefully considered. The argument is not based upon what has been done under the provisions, but is chiefly based upon what *could* be done, or how the provisions *could* be interpreted. For instance, in the Government's brief (p. 66), counsel states:

"In the agreement with Columbia Pictures Corporation * * * the following clause appears, 'It is agreed that the exhibitor can revise the schedule of allocation by towns, provided the total amount of money by picture, in each classification, for the Circuit remains the same.' * * * The effect on competition of such a right is too clear to require elucidation."

Then counsel proceeds to elucidate as follows:

"Under the terms of such contracts the Griffith Circuit could allocate the entire amount of rental to its most prosperous theatre and utilize all the others in the

chain as fighting theatres to drive out the independent exhibitors in the other towns in which it exhibited the distributor's pictures. * * *"

There is no evidence in the record that any such conduct was indulged in by the defendants, or that such sinister thoughts occurred to them. There is a vast difference between what *might have been done* and what *could have been done* and what *was done.*

Counsel argues further in the brief (p. 67):

"In the three-year franchise of Paramount Pictures, * * * the following clause appears, 'Distributor agrees to release exhibitor from the obligation covering any individual town which the exhibitor may find it necessary to close permanently.' The effect of such a clause is similar to that granted to allocate pictures between towns. It is also capable of the construction that a distributor may by entering into a pooling arrangement with a competitor decide to close his theatre in a particular town and thus restrain the interstate distribution of product."

This would be a strained construction of a simple and unambiguous clause in a contract, the ordinary and clear meaning of which is obvious.

Again counsel states (p. 67):

"In the contract between the RKO and the Griffith Circuit * * * this clause appears, 'It is agreed that if the exhibitor shall during the term of this agreement open additional theatres in any of the towns covered herein, with the exception of Oklahoma City, that any of the feature photoplays and short subject photoplays may be exhibited therein in place of the theatres named herein.' The effect of this clause is to arm Griffith with an assured franchise to license pictures in any theatre which he may desire to open even though he decided to open it solely for the purpose of destroying a competitor's business. It is difficult to conceive of greater relinquishment of control of its film distribution than this one and its inclusion in a master deal belies the protestations that each theatre was considered in arriving at the rental prices fixed in the master deals.

"Under the terms of this clause, the Griffith Circuit was empowered to open the flimsiest kind of a converted store show immediately adjacent to its independent competitor and without fear of loss of product play the top pictures of the distributor."

This also is a strained construction. The clause is simple and plain and admits of no inference of a sinister or hidden meaning when the contract is considered as a whole. Counsel has overlooked many contingencies in arriving at such a construction. Here is a contract covering many towns. A theater may be destroyed by fire or storm; a lease may expire and cannot be renewed; local authorities may condemn a building for theater use. Any number of things might occur to cause an exhibitor to open another theater in a town covered by the contract. The exhibitor has provided himself by license with moving picture films to operate his theaters in a town over a period of time. Thus with good foresight and business judgment he provides for such a contingency. The clause does not give the exhibitor any new or additional product. It simply permits him in such event to use product, that under his contract he has obligated himself to play and pay for, by exhibiting the same film in the same town in a location other than the one named in the contract. This gives him no unfair advantage over his competitor, takes away none of his competitor's product, and certainly in no way unreasonably restrains commerce, nor can it be construed as an intent to monopolize.

Under proposition (b), "the agreements between exhibitors for collective licensing restrain competition and were an unreasonable restraint of trade," counsel for the Government argues as follows (p. 68):

"In some 48 instances, agreements were entered into under the terms of which booking of pictures would be handled by the Griffith Circuit. Each of these agreements pro tanto reduced the bargaining power of a major distributor and constituted a combination against him for the securing of the special privileges some of which have been discussed above. Moreover, they had the effect of preventing competition be-

tween the exhibitors entering into them for the booking was centrally controlled."

Again we have an assumption that all of the defendants were combined in one circuit which is far from being supported by the record. Counsel assumes this position from the fact that all of the defendants, until the 1938–1939 season, negotiated the purchase and booking of films through R. E. Griffith as agent for the parties involved in the deals.

There is no difference in principle in the instant case and the case of Appalachian Coals, Inc., et al. v. United States, 288 U. S. 344, 357, 359, 377, 53 S.Ct. 471, 473, 77 L.Ed. 825, except in the case at bar it is contended the defendants were operating collectively by purchasing and booking through an exclusive buying agency and in the case cited an exclusive selling agency was under attack. In the discussion of it, Mr. Chief Justice Hughes said:

"The challenged combination lies in the creation by the defendant producers of an exclusive selling agency. * * *"

\* \* \* \* \* \*

"First. There is no question as to the test to be applied in determining the legality of the defendants' conduct. The purpose of the Sherman Anti-Trust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. * * * The decisions establish, said this Court in Nash v. United States, 229 U.S. 373, 376, 33 S. Ct. 780, 781, 57 L.Ed. 1232, 'that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.' (Citing numerous authorities.)

"In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it. 'The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains.' Chicago Board of Trade v. United States, supra. (246 U.S. 231, 38 S. Ct. 242, 62 L.Ed. 683) The familiar illustrations of partnerships, and enterprises fairly integrated in the interest of the promotion of commerce, at once occur. The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions. * * *"

\* \* \* \* \* \*

"* * * The Anti-Trust Act aims at substance. Nothing in theory or experience indicates that the selection of a common selling agency to represent a number of producers should be deemed to be more abnormal than the formation of a huge corporation bringing various independent units into one ownership. Either may be prompted by business exigencies and the statute gives to neither a special privilege. The question in either case is whether there is an unreasonable restraint of trade or an attempt to monopolize. * * *"

If the Act "aims at substance" and if "realities must dominate the judgment" and we apply these principles here, then it is apparent that a similar condition confronted the defendants Griffith Amusement Company and Consolidated Theatres, at the time R. E. Griffith severed his active connection with them. It was good business judgment to procure his services for the corporations. He, by training and experience, was well fitted for it. What is abnormal about such an arrangement? But that is not all there is to the administrative agreements. Counsel apparently overlooks the fact that the agreements provide for many types of service, the buying and booking of films is only one incident, and that for all the services to be performed under it, a specified fee is to be charged.

The administrative contracts are of two general kinds or types. Counsel for defendants quite clearly describe them in their brief (pp. 70, 71), as follows:

"One type is an agreement between one of the corporate defendants and a third party with whom it was jointly operating a theatre or theatres in a certain town, set-

ting forth the terms of the partnership operation, the duties to be performed by each party, the compensation to be received by each party, the division of profits, and other details of the operating agreement."

"The second type of contract reflected in those exhibits is a contract between Griffith Amusement Company and Consolidated Theatres, Inc., or Consolidated Theatres, Inc., and its partner, as the owners and operators of theatres, whereby for an agreed percentage of the gross box office receipts Griffith Amusement Company agreed to perform certain services, including the licensing and booking of pictures."

Suffice it to say the objectionable paragraph pointed out by the Government is not the controlling feature of the contracts but is merely incidental. The contracts must be considered as a whole, and when so considered, there is nothing abnormal about them and no hidden or sinister meaning in them. There is nothing in them that signifies any intent to unreasonably restrain trade, stifle competition or monopolize.

Proposition (c), the agreements between exhibitors by which one agreed not to compete with the other either by a pooling arrangement or by a sale of good will constituted unreasonable restraints of trade, calls for a consideration of the facts and circumstances surrounding these two characters of transaction.

The alleged pooling arrangements stressed by the Government are in the situations at Chickasha, Enid and Stillwater, Oklahoma. The defendants designate them as partnership agreements. But regardless of their designations, they are agreements that affected local situations concerning economy, expense and efficiency in operation that called for that character of agreement. In the Chickasha situation, no competition of the two circuits was affected in any manner, and the mere fact that an unprofitable and unsuitable theater was abandoned and one party to the contract finally became the owner of the theater by a mutual and satisfactory sale does not condemn the transaction as monopolistic. In the Stillwater situation, under the circumstances surrounding the transaction, there is nothing sinister or abnormal about it. On account of the depression and the inexperience of Russ, the operator of the competing theater, it is apparent that his proposition to Griffith Amusement Company was reasonable, and the terms of the agreement had the effect of mutually assisting both organizations in the situation which was purely a local one. The Enid situation also was a purely local affair and there was nothing abnormal about the contract or its effect. All of these three contracts are shown by the evidence to have been brought about by efforts to economize and more efficiently operate, with no apparent desire to stifle competition, unreasonably restrain, or monopolize. "The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it." Appalachian Coals, Inc., v. United States, supra.

Under this contention, the Government stresses the restrictive covenant found in the contracts in the purchase of theaters. In these contracts, as a part of the consideration, it is provided that in purchasing the good will, the vendor is not to engage in the same business for a specified time and at a specified place. There is nothing abnormal or unusual in this character of contract. What is known as good will, that has been built up by an owner of a business, is a valuable asset, and in the sale of that business he should be able to profit by it. This right has been so recognized and approved by our courts.

A great many of these contracts are Oklahoma contracts and are governed by state statute.

Section 217, Title 15 Okl.St.Ann.1941, provides:

"Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by the next two sections, is to that extent void."

Section 218 of the same title provides:

"One who sells the good-will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city or part thereof, so long as the buyer, or any person deriving title to the good-will from him carries on a like business therein."

194

After carefully considering the Oklahoma contracts in view of the state statutes and the decisions of the Supreme Court interpreting them, there can be no question as to their validity in that state. The contracts concern the sale of theaters, leases, equipment, et cetera, as well as good will. The covenants stressed by the Government are all based upon the purchase of the good will of the vendor. Whether they violate the Sherman Act would depend upon the intent of the parties, or the results effected.

In United States v. Addyston Pipe & Steel Co. et al., 6 Cir., 85 F. 271, 280, 46 A.L.R. 122, in discussing the character of contract under consideration, the court said:

"The inhibition against restraints of trade at common law seems at first to have had no exception. See language of Justice Hull, Year Book, 2 Hen. V., folio 5, pl. 26. After a time it became apparent to the people and the courts that it was in the interest of trade that certain covenants in restraint of trade should be enforced. It was of importance, as an incentive to industry and honest dealing in trade, that, after a man had built up a business with an extensive good will, he should be able to sell his business and good will to the best advantage, and he could not do so unless he could bind himself by an enforceable contract not to engage in the same business in such a way as to prevent injury to that which he was about to sell. It was equally for the good of the public and trade, when partners dissolved, and one took the business, or they divided the business, that each partner might bind himself not to do anything in trade thereafter which would derogate from his grant of the interest conveyed to his former partner. Again, when two men became partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union of their capital, enterprise, and energy to carry on a successful business, and one useful to the community. * * *"

And again, in considering whether the contract effected an unreasonable restraint in trade, the court quoted with approval from the case of Horner v. Graves, 7 Bing. 735, as follows:

"We do not see how a better test can be applied to the question whether this is or not a reasonable restraint of trade than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party requires can be of no benefit to either. It can only be oppressive. It is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void on the ground of public policy."

In Goldberg et al. v. Tri-States Theatre Corporation, 8 Cir., 126 F.2d 26, 29, an injunction was sought based upon the violation of a restrictive clause in a contract similar to the one at bar. In passing upon the clause as to whether it effected a restraint in trade, the court said:

"The validity of the agreement, as a restraint upon trade, is not seriously open to question under the general contract law of Nebraska. An agreement which places a restriction upon the use of certain real estate is not invalid in Nebraska, as being an unreasonable restraint of trade, where the restriction is purely ancillary to the acquiring of an interest in another piece of real estate for commercial purposes; where it places only a limited restraint as to period and manner of the use of such property; where it does not appear to be greater than reasonably to serve as a protection in accomplishing the legitimate commercial purpose for which the interest in the other real estate involved was acquired; and where it does not have as its primary object or as its direct result the fostering of some illegal monopoly."

And in summing up the transaction, the court said:

"Under all the circumstances of the transaction, it must be held that the restrictive agreement was intended simply and fairly to protect the interests created by the new sublease and the purchase of the 99 year lease-hold; that it was only such a reasonable protection as any pur-

chaser in good faith would have required under the circumstances of the transaction; that the situation which prompted the deal and the relationship in which the parties dealt afford no sound basis for inferring that it was dominated by any purpose of fostering an illegal monopoly under a previous combination and conspiracy, if any such combination ever had existed, as appellants contend; and that, so far as the public was concerned, it was not intended to and did not serve to achieve any such harmful or illegitimate result."

The situations involved in the Oklahoma contracts containing the restrictive clauses could not be stated in more apt language. Under all the facts and ciruumstances surrounding the various Oklahoma contracts, they appear both valid and reasonable.

The Government particularly stresses the covenant in the contract of sale between A. M. Morgan and Jack Pickens, as agent for the Brady Amusement Company, Westex Theatres and R. E. Griffith Theatres, in which Morgan sold the Ritz theater at Brady, Texas. The evidence clearly discloses that Morgan's purpose in acquiring theaters was not so much with the idea of operating the theaters as it was to sell out to a competitor. Under the circumstances surrounding that sales transaction it is quite easy to understand why the purchaser might desire such a covenant in the contract of sale that was agreed upon, which was that Morgan "will not engage in the moving picture business or theatre business of any kind or character, directly or indirectly, in any town in the States of Texas, Oklahoma and New Mexico in which he might be in competition with Brady Amusement Company, Westex Theatres, Inc., or the R. E. Griffith Theatres, Inc., for a period of five years from this date." If the provision in the contract were put to a test, it may be admitted that it would be held to be valid as to the town of Brady, Texas, and invalid as to the other territory attempted to be covered. But so far as it affects the question before us, taking into consideration the facts and circumstances surrounding the transaction, there is nothing that would justify the conclusion that the parties defendant who were parties to this contract were in a conspira- cy or combination to control the exhibition of moving picture films at Brady, Texas, or any other place, or that the restrictive covenant in the contract would justify the conclusion that there was an intent upon the part of those defendants to stifle competition in the exhibition of films, or to unreasonably restrain interstate trade or commerce in them, or that it had any such effect. The sale as it was ultimately closed was initiated by Morgan and was satisfactory to him. He was not unreasonably restrained in the town of Brady, Texas, and he makes no complaint that he was so restrained at any other place. The public was in no manner adversely affected by the transaction.

■ As to proposition (d), that the Sherman Act was violated by unreasonable restraints resulting from implied agreements between defendants and distributors: The court is not required to search for implied agreements in the face of the fact that the agreements are all written, signed by the parties, and are unambiguous in meaning. We are again called upon to speculate and guess at some hidden or concealed perfidy that does not appear in the instruments themselves. Where a conspiracy is charged, it is the duty of the court to scrutinize and consider carefully any and all transactions that would throw any light upon the issue, and where the evidence consists of written agreements, those agreements and the circumstances surrounding their execution should be considered carefully. The purpose of the agreement, the object the parties had in mind and the results accomplished must all be considered. But when that is done and no serious fault found in the instruments, then it is not the duty of the court to speculate and guess as to what *could be done* or what *might be done,* or the effect that *might be accomplished* under the agreement, when the possible purpose was totally foreign to what the parties expressed in the agreement.

■ The Government contends that "Section 2 of the Act was violated by the defendants in monopolizing the business of operating theatres and the supply of major films." Under this contention, buying power and its effect are again emphasized.

This question has had consideration in discussing the previous contention. Suffice it to say here that the evidence fails to disclose that the defendant exhibitors in the buying and booking of moving picture films contracted for any greater supply of product than they believed was reasonably necessary to supply the demands of the public in the various situations. In the purchase of their product, the positive evidence is quite clear that there was no intent upon the part of the defendants to control, stifle competition in or monopolize the industry in the territory, or to unreasonably restrain interstate distribution of moving picture films. For that reason it is not apparent how the case of United States v. Aluminum Co. of America et al., 2 Cir., 148 F.2d 416, relied upon by the plaintiff, applies here. The distinction is clear. Speaking of the Aluminum Company, the court said:

" * * * It was not inevitable that it should always anticipate increases in the demand for ingot and be prepared to supply them. *Nothing compelled it to keep doubling and redoubling its capacity* before others entered the field. * * * " (Emphasis supplied.) Id. page 431.

In the case at bar we have no such situation. There is a vast difference between ingots and moving picture films. Ingots of aluminum are a staple and fixed product. Moving picture films are a fluctuating and uncertain product. Until a film has been exhibited no one knows or can accurately estimate its value as a box-office attraction, either as a first-run exhibition or a subsequent run exhibition. What the demand for its exhibition may be by the public is an unknown factor. The market in which it is procured by the exhibitor is a competitive one in which all exhibitors may enter and compete in compliance with the rules and customs of the industry, as they then exist, to obtain the product. Unless some unfair or illegal advantages are taken by one competitor, his rival in business should not be heard to complain because he has been unsuccessful in procuring the product.

Second proposition: If the court would be justified in concluding that such an inference could be drawn, would the court be further justified in concluding that such an inference should control over the positive and direct testimony of the witnesses to the contrary?

When conspiracy is one of the elements of the charge against a defendant, the very charge itself is of such a nature that circumstantial evidence may be the character of evidence that will be relied upon to sustain the charge. The law imposes upon the plaintiff the burden of sustaining the allegations of his complaint by a preponderance of the evidence. In a case such as we have here it is the duty of the court to determine whether or not the allegations of the complaint are so sustained. The court is entitled to have presented positive evidence when it is obtainable, and not be compelled to search the record for inferences that may be drawn.

The positive testimony concerning the transactions and conduct of the parties by those who were in a position to know, so far as the negotiations of the defendants and various distributors are concerned, is that no combination, understanding or agreement existed between them that had for its purpose the control of the exhibition of moving picture films by any of the defendants, or any unreasonable restraint in trade in the product, or monopolization by the defendants of the product, or the stifling of competition upon the part of the defendants and the distributors. In fact they all state that the competitors of the defendants were never mentioned in the negotiations for film contracts. The Government, however, from testimony detailing trivial circumstances which in each case is positively denied by witnesses who appear to the court to be worthy of belief, in connection with the documentary evidence, assumes that the court must infer the existence of a combination and conspiracy.

The Government cites United States v. Crescent Amusement Co. et al., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160, and United States v. Schine Chain Theatres, Inc., et al., D.C.N.Y., 1945, 63 F.Supp. 229. When these two cases are analyzed they are easily distinguished from the case at bar. In the Crescent Amusement Co. Case, many of the things charged by the Government, which are similar to the charges here, the trial court found to be sustained by the evidence. Upon the appeal the only question

before the court was whether there was evidence to sustain the lower court, and the court said:

"The crux of the government's case was the use of the buying power of the combination for the purpose of eliminating competition with the exhibitors and acquiring a monopoly in the areas in question. There was ample evidence that the combination used its buying power for the purpose either of restricting the ability of its competitors to license films or of eliminating competition by acquiring the competitor's property or otherwise. For example, the defendants would insist that a distributor give them monopoly rights in towns where they had competition or else defendants would not give the distributor any business in the closed towns where they had no competition. * * *" 323 U.S. 181, 65 S.Ct. 258, 89 L.Ed. 160.

\* \* \* \* \* \*

" * * * But the vice of this undertaking was the combination of several exhibitors in a plan of concerted action. They had unity of purpose and unity of action. They pooled their buying power for a common end. It will not do to analogize this to a case *where purchasing power is pooled so that the buyers may obtain more favorable terms.* The plan here was to crush competition and to build a circuit for the exhibitors. * * *" (Emphasis supplied.) 323 U.S. 183, 65 S.Ct. 259, 89 L.Ed. 160.

Although the charge is similar to the charge in the instant case, the proof is not. In the case at bar there is no testimony by any witness to that effect, but the testimony is to the contrary.

The Schine Case, supra, is not applicable here for the same reason and is thus clearly distinguishable. It is true that the Government followed practically the same pattern in its charges in that case as in the instant case. But in the Schine Case it satisfied the court with ample proof to sustain the charges and in the case at bar it has wholly failed to sustain the charges by a fair preponderance of the evidence.

The Government also cites the case of Interstate Circuit, Inc., et al. v. United States, 306 U.S. 208, 213, 59 S.Ct. 467,

468, 83 L.Ed. 610. This case is also easily distinguished. There the court again was passing upon the sufficiency of the findings of fact to support the decision of the court and stated:

"The case is now before us on findings of the District Court specifically stating that appellants did in fact agree with each other to enter into and carry out the contracts, which the court found to result in unreasonable and therefore unlawful restraints of interstate commerce."

\* \* \* \* \* \*

"The trial court *drew the inference of agreement from the nature of the proposals made on behalf of Interstate and Consolidated;* from the manner in which they were made; from the substantial unanimity of action taken upon them by the distributors; *and from the fact that appellants did not call as witnesses* any of the superior officials who negotiated the contracts with Interstate or any official who, in the normal course of business, would have had knowledge of the existence or non-existence of such an agreement among the distributors. This conclusion is challenged by appellants because not supported by subsidiary findings or by the evidence. We think this inference of the trial court was rightly drawn from the evidence. * * *" 306 U.S. 221, 59 S.Ct. 472, 83 L.Ed. 610. (Emphasis supplied.)

And the court further amplified as follows:

" * * * Taken, together, the circumstances of the case which we have mentioned, *when uncontradicted and with no more explanation than the record affords,* justify the inference that the distributors acted in concert and in common agreement in imposing the restrictions upon their licensees in the four Texas cities.

"This inference was supported and strengthened *when the distributors, with like unanimity, failed to tender the testimony, at their command,* of any officer or agent of a distributor who knew, or was in a position to know, whether in fact an agreement had been reached among them for concerted action. When the proof supported, as we think it did, the inference of such concert, the *burden rested on appel-*

*lants of going forward with the evidence to explain away or contradict it.* They undertook to carry that burden by calling upon local managers of the distributors to testify that they had acted independently of the other distributors, and that they did not have conferences with or reach agreements with the other distributors or their representatives. *The failure under the circumstances to call as witnesses those officers who did have authority to act for the distributors and who were in a position to know whether they had acted in pursuance of agreement is itself persuasive that their testimony, if given, would have been unfavorable to appellants.* The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. (Citing authorities.)" (Emphasis supplied.) 306 U.S. 225, 59 S.Ct. 474, 83 L.Ed. 610.

Even if the court would be justified in inferring from the Government's evidence, consisting largely of a documentary character, that a combination or conspiracy existed upon the part of the defendants and distributors as alleged in the complaint, and the burden was thus cast upon the defendants to "explain away or contradict it," the defendants have met and discharged that burden to the thorough satisfaction of the court with positive evidence from those officers of the distributors who negotiated with the defendant exhibitors.

Third proposition: Is buying power alone, resulting from thrift, fair dealing and industry, sufficient to justify the inference that a combination or conspiracy exists for the purpose of, and is being used in negotiations to, unreasonably restrain trade, stifle competition, or create a monopoly in a given product, or must it be established by a fair preponderance of the evidence that a combination or conspiracy exists and has for its purpose the use of such buying power to obtain those specific results?

When we come to consider this proposition, the law is well settled that the size of an institution, regardless of a power that might be exercised on account thereof, is not in itself an offense against the statute. The principle is well expressed in United States v. International Harvester Co. et al., 274 U.S. 693, 708, 47 S.Ct. 748, 753, 71 L.Ed. 1302, where the court said:

"* * * The law, however, does not make the mere size of a corporation, however impressive, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its power. United States v. United States Steel Corporation, 251 U.S. 417, 451, 40 S.Ct. 293, 64 L.Ed. 343, 8 A. L.R. 1121. * * *"

In Federal Trade Commission v. Paramount Famous-Lasky Corporation et al., 2 Cir., 57 F.2d 152, 157, the court said:

"* * * But the size alone does not give rise to a violation of the law. United States v. International Harvester Co., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302; United States v. U. S. Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121. * * *"

In United States v. United States Steel Corporation et al., 251 U.S. 417, 450, 451, 40 S.Ct. 293, 298, 64 L.Ed. 343, 8 A.L.R. 1121, the court said:

"* * * The government, therefore, is reduced to the assertion that the size of the corporation, *the power it may have, not the exertion of the power,* is an abhorrence to the law, or, as the government says, 'the combination embodied in the corporation unduly restrains competition by its *necessary effect,* (the italics are the emphasis of the government), and therefore is unlawful regardless of purpose.' 'A wrongful purpose,' the government adds, is 'matter of aggravation.' The illegality is statical; purpose or movement of any kind only its emphasis. To assent to that, to what extremes should we be led? Competition consists of business activities and ability—they make its life; but there may be fatalities in it. Are the activities to be encouraged when militant, and suppressed or regulated when triumphant, because of the dominance attained? To such paternalism the government's contention, *which regards power, rather than its use,* the determining consideration, seems to conduct. Certainly conducts we may say, for it is the inevitable logic of the government's contention

that competition must not only be free, but that it must not be pressed to the ascendency of a competitor, for in ascendency there is the menace of monopoly.

"We have pointed out that there are several of the government's contentions which are difficult to represent or measure, and the one we are now considering, that is, the power is 'unlawful regardless of purpose,' is another of them. It seems to us that it has for its ultimate principle and justification that strength in any producer or seller is a menace to the public interest and illegal, because there is potency in it for mischief. The regression is extreme, but short of it the government cannot stop. The fallacy it conveys is manifest.

" * * * The corporation is undoubtedly of impressive size, and it takes an effort of resolution not to be affected by it or to exaggerate its influence. *But we must adhere to the law, and the law does not make mere size an offense, or the existence of unexerted power an offense.* It, we repeat, requires *overt acts,* and trusts to its prohibition of them and its power to repress or punish them. It does not *compel* competition, nor require all that is possible." (Emphasis supplied.)

In United States v. Standard Oil Co. of New Jersey et al., C.C.Mo., 173 F. 177, 196, in discussing the principle of law under consideration here, Mr. Justice Sanborn said:

" * * * On the other hand, Congress did not intend to impede legitimate commercial activity, nor put a limit to its fruits. The genius and industry of man, when kept to ethical standards, still have full play, and what he achieves is his; and this applies as well to a corporation, in which the energies of many are concentrated under the authority of law in a single organization. A railroad company, for instance, which has extended its line across the continent and conquered the waste or wilderness, is not a monopoly within the statute merely because its capital is great and it alone serves the tributary country; and so of an industrial corporation, the wisdom and business sagacity of whose managers have foreseen and taken advantage of the natural tendencies of trade and caused it to outstrip all competition. Suc-

cess and magnitude of business, the rewards of fair and honorable endeavor, were not among the evils which threatened the public welfare and attracted the attention of Congress. But when they have been attained by wrongful or unlawful methods, and competition has been crippled or destroyed, the elements of monopoly are present. * * *"

The theories and contentions of the parties have been patiently followed by the court but there is nothing in the evidence to justify the conclusion that any buying power possessed by the defendants was ever exerted by the defendants to "secure contracts for exhibition rights to the films of the major distributors which gave the defendants an unreasonable control in licensing such film to others in the various towns in the territory covered by the complaint." There is nothing in the evidence that would justify the conclusion that the buying power of the defendants was used to absorb or otherwise eliminate a number of actual and potential competitors, nor that would justify the conclusion that the possession of the power or the manner in which it was used is a violation of the Sherman Act.

The Government has failed to establish by a fair preponderance of the evidence that the defendants have purchased or contracted for more moving picture films than they believed were, or in fact were, reasonably necessary to supply their theaters. Competition was fair under the circumstances of each situation involved. The defendants went into the open market and bought their product from the distributors in the same manner as was open to all competitors. The defendants were alert and progressive and took such advantages only as were natural in the industry. There is nothing in the evidence to justify the conclusion that the distributors were overawed or overreached in their dealings with defendants; or that the distributors were compelled or coerced into entering into any contract with the defendants by reason of the buying power of the defendants, or from any other cause. There is no evidence that would justify the conclusion that any combination or agreement of any character existed between the defendants and

the distributors that had for its purpose the stifling of competition in, or monopolization of, the exhibition of moving picture films, or to unreasonably restrain trade or interstate commerce in such exhibition of moving picture films, that has been occasioned or brought about by the manner in which the defendants used any buying power they possessed.

Findings of fact and conclusions of law will be filed simultaneously with this opinion. A form of judgment consistent with this opinion and the findings of fact and conclusions of law may be submitted within fifteen days from this date.