# UNITED STATES *v.* INTERNATIONAL HARVESTER COMPANY ET AL.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA.

No. 254. Argued October 26, 1926.—Decided June 6, 1927.

1. In a suit under the Anti-Trust Act, against a corporation, which had combined others engaged separately in interstate trade in harvesting machines, a consent decree was entered requiring the defendant to limit its sales agencies and dispose of some of its lines to independent manufacturers, the decree declaring that the object to be attained under its terms was to restore competitive conditions, and providing that, in the event that such conditions should not have been established at the expiration of a specified period, the United States should have the right to such further relief in the case as should be necessary to restore them and to bring about a situation in harmony with law. The requirements having been complied with and lawful competitive conditions established,

   *Held* that to construe the decree as nevertheless entitling the United States to further relief by division of the defendant into separate and distinct corporations for the purpose of restoring the competitive conditions that existed sixteen years before the entry of the consent decree would be repugnant to the agreement embodied in the decree, which had become binding on all parties and upon which the defendant was entitled to rely. P. 702.

2. Statements in a report of the Federal Trade Commission to the Senate based upon an *ex parte* investigation, are not in themselves substantive evidence in a subsequent suit by the Government under the Anti-Trust Act. P. 703.

3. From the evidence the Court finds that competitive conditions in the trade in harvesting machines have been established in compliance with the consent decree herein. P. 704.

4. The law does not make the mere size of a corporation, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its power. P. 708.

5. The fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination. P. 708.

10 F. (2d) 827, affirmed.

APPEAL from a decree of the District Court dismissing a supplemental petition of the United States for relief in addition to that granted by an earlier decree in a suit under the Anti-Trust Act. See 214 Fed. 987.

*Assistant to the Attorney General Donovan,* with whom *Solicitor General Mitchell* and *Mary G. Connor,* Special Assistant to the Attorney General, were on the brief, for the United States.

*Mr. William S. Elliott,* with whom *Messrs. Frank H. Scott* and *Victor A. Remy* were on the brief, for appellees.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This is a direct appeal, under § 238 of the Judicial Code as amended by the Jurisdictional Act of 1925,[1] from a final decree of the District Court—specially constituted under the Expediting Act[2] and composed of three Circuit Judges—dismissing a supplemental petition of the United States to obtain further relief in addition to that granted by an earlier decree in the same case.

In the original petition, which was filed in 1912, the United States alleged that the International Harvester Company[3]—hereinafter referred to as the International Company—and other defendants were engaged in a combination restraining interstate trade and commerce in harvesting machines and other agricultural implements and monopolizing such trade in violation of the Anti-Trust Act;[4] that the International Company had been

---

[1] 43 Stat. 936, c. 229, § 1.

[2] 32 Stat. 823, c. 544; amended, 36 Stat. 854, c. 428.

[3] This name is used in the decrees and briefs as including both the original defendant and a new company of the same name, which took over in 1918 the property and business of the original company, and entered its appearance in the case as a defendant.

[4] 26 Stat. 209, c. 647; U. S. C., Tit. 15, § 1, *et seq.*

formed by certain of the other defendants in 1902, with a capital stock of $120,000,000, for the purpose of combining five separate companies then manufacturing and selling harvesting machinery, whose aggregate output exceeded 85 per cent. of such machinery produced and sold in the United States, and thereby eliminating competition between these companies, restraining and monopolizing the interstate trade in such machinery, and promoting a similar monopoly in other agricultural implements; that in pursuance of such purpose the International Company acquired in 1902 the entire property and business of these five companies; that it thereafter acquired the property and business of various competitors and the control of steel, coal and other subsidiary companies, added all other classes of agricultural implements to its lines, used various unfair trade methods and practices to destroy its competitors, closed the opportunities for new competitors in all lines of agricultural implements, and advanced the price of harvesting machinery; and that it was then producing at least 90 per cent. of the grain binders and 75 per cent. of the mowers produced and sold in the United States, and over 30 per cent. of all agricultural implements other than harvesting machinery.

After an extended hearing on the merits, the District Court held—one judge dissenting—that although it was not shown that there had been any unfair or unjust treatment by the International Company of its competitors and there was nothing in the history of its expanding lines which should be condemned, it had been, from its beginning in 1902, and then was, a combination violating the Anti-Trust Act, suppressing competition between the five original companies and directly tending to a monopoly, a condition that had been accentuated by its subsequent acquisition of competing plants and subsidiary companies; and that the entire combination and monop-

oly should be dissolved. 214 Fed. 987.- By the decree as originally entered in August,.1914, it was "adjudged and decreed that said combination and monopoly be forever dissolved and to the end that the business and assets of the International Harvester Company be separated and divided among at least three substantially equal, separate, distinct, and independent corporations with wholly separate owners and stockholders," and that the defendants submit a plan of such separation for the consideration of the court; and jurisdiction was retained to make such additional decrees as might be necessary to secure the final dissolution of the combination and monopoly. This was subsequently modified by a decree entered in October, 1914, by which, pursuant to an agreement with the Attorney General of the United States, the provision requiring the business and assets of the International Company to be separated and divided among at least three distinct corporations was stricken out, and a provision was substituted requiring that its business and assets "be divided in such manner and into such number of parts of separate and distinct ownership as may be necessary to restore competitive conditions and bring about a new situation in harmony with law."

The defendants appealed from the final decree to this Court; but, before the case had been decided, dismissed their appeal, pursuant to an agreement between the parties. And after the case had been remanded to the District Court, upon a stipulation signed by the Attorney General of the United States and the solicitors for the defendants, a consent decree was entered therein, on November 2, 1918, which, after reinstating the former decree as modified, recited that, "the parties having agreed upon and submitted to the court a plan for carrying into effect the order contained in said decree that the combination and monopoly therein adjudged unlawful be dis-

solved, and the court having considered and approved the plan, it is further ordered, in accordance therewith, as follows ": (a) The International Company is prohibited and enjoined from having more than one representative or agent in any city or town for the sale of harvesting machines and other agricultural implements; (b) It shall offer for sale to responsible manufacturers of agricultural implements, the harvesting machine lines made and sold by it under the trade names of Osborne, Milwaukee, and Champion, respectively, with the equipment specially used in their manufacture, and accept a reasonable price from any purchaser approved by the United States; (c) It shall also endeavor to sell in connection with said harvester lines the Champion and Osborne harvester plants, and accept a reasonable price therefor from the purchasers of said harvester lines; (d) If any of said harvester lines, including plant, etc., shall not have been sold within one year after the close of the existing war, then, upon request of the United States, the same shall be sold at public auction; (e) " The object to be attained under the terms of this decree is to restore competitive conditions in the United States in the interstate business in harvesting machines and other agricultural implements, and, in the event that such competitive conditions shall not have been established at the expiration of eighteen months after the termination of the existing war  .  .  . then and in that case the United States shall have the right to such further relief herein as shall be necessary to restore said competitive conditions and to bring about a situation in harmony with law; and this court reserves all necessary jurisdiction and power to carry into effect the provisions of the decrees herein entered."

Thereafter, in 1920, after a hearing upon evidence, the court entered an order adjudging and decreeing, the United States consenting thereto, that the decree of 1918,

properly interpreted, did not require the International Company to offer for sale the Champion and Osborne harvester plants except in connection with sales of the respective harvester lines; and further adjudging and decreeing that inasmuch as the International Company had, pursuant to the provisions of said decree, " duly sold " the Champion and Osborne harvester lines to companies which did not desire to purchase the respective plants, the latter were not subject to sale under the provisions of said decree.

In July, 1923, more than eighteen months after the termination of the war, the United States filed in the District Court the supplemental petition here involved, for the purpose, as stated, of securing, in accordance with clause (e) of the decree of November 2, 1918, such further relief as should be " necessary to restore competitive conditions in interstate business in harvesting machines and other agricultural implements, and bring about a situation in harmony with law." This petition alleged that the output and sales of the Champion, Osborne and Milwaukee harvesting lines which the International Company had been required to sell under that decree, constituted such a small part of its total output and sales and such a negligible part of the total trade in harvesting machines in the United States, that the decree was inadequate to accomplish its declared purpose; that the sale of the Osborne and Champion lines had had little or no effect upon competitive conditions; that, although the Milwaukee line had not been sold, the United States had not requested its sale at public auction under clause (d) of the decree, as its separation could have no appreciable effect on competition; that the International Company's control of interstate trade in harvesting machines had increased from 1918 to 1922; that the number of independent manufacturers of harvesting machines was steadily shrinking, due to their inability to compete with the In-

ternational Company, which, with its large capital, credit, resources, profitable side lines and subsidiaries, was enabled, particularly in times of depression, to sell its harvesting machines at cost, generally lower than that of its competitors, and thus effectually eliminate competition and monopolize the business; that it had used its power in this manner, particularly since the decree of 1918, for the purpose and with the effect of restraining and monopolizing trade in harvesting machines by compelling its competitors to cease their manufacture and sale; and that unless the combination and monopoly that had been found to exist should be effectively dissolved by dividing the International Company into at least three separate concerns, its monopolistic control would increase and become complete.

The petition prayed that the court adjudge and decree that the International Company still was a combination and monopoly restraining interstate trade in harvesting machinery; that the decree of 1918 was inadequate to achieve its declared purpose and the United States was entitled to the further relief necessary to restore competitive conditions and bring about a situation in harmony with law; and that the business and assets of the International Company " be separated and divided among at least three separate, distinct and independent corporations of wholly separate owners, stockholders and managers, substantially as suggested by the Federal Trade Commission in its report to the Senate dated May 4, 1920," which was filed as an exhibit to the petition.

The report thus referred to had been made pursuant to a Senate Resolution of May, 1918, directing the Federal Trade Commission to investigate the causes for the high prices of agricultural implements, and any restraint of trade therein. The Commission had made an *ex parte* investigation, covering mainly the period from 1913 to 1918, and based largely upon data furnished by various

manufacturers of agricultural implements concerning their costs, profits, etc., the results of which were tabulated by its accountants, partly in connection with a previous report that had been made by the former Bureau of Corporations. In this report—made only a year and a half after the entry of the consent decree of 1918 and before the war had terminated—the Commission had expressed the opinion that this decree would fail of its purpose to restore competitive conditions and that further steps were necessary to secure its object; and had recommended that the business and assets of the International Company be divided among three new companies as therein outlined. A copy of this report had also been transmitted to the Attorney General; and thereafter the Government, adopting the recommendation of the Commission, filed this supplemental petition.

The petition was answered; an examiner appointed and evidence taken in 1924. In March of that year, as shown by the evidence, the International Company sold its Milwaukee line of harvesting machines, subject to the approval of the Attorney General or the court.

At the hearing, in 1925, the District Court found that the International Company had complied with the requirements of clauses (a), (b), (c) and (d) of the decree of 1918, and, without attempting to recite the evidence [5] on the disputed questions of fact arising under the Government's application for further relief under clause (e), stated its conclusions—two judges concurring—as follows: " The evidence in this case has convinced, not only that it fails to prove by a fair, or, any, preponderance thereof that the International Harvester Company, since the sale of the ' Osborne,' ' Milwaukee,' and ' Champion ' lines and their appurtenances, has been or is unduly or

---

[5] This, which consisted of "many volumes," as condensed in the record in this Court, including tabulated statements and other documentary exhibits, covers about 600 printed pages.

unreasonably monopolizing or restraining interstate commerce in harvesting machines or their appurtenances in the United States; but in our opinion it conclusively proves that it has not done and is not doing so, that competition in the manufacture and sale of harvesting machines and their appurtenances in interstate commerce in the United States has been and is free and untrammeled, that the percentage of all such machines that were made and sold by the International Harvester Company has decreased from about 85 per cent. in 1902, to about 64 per cent. at the time of the decree of November 2, 1918, and ever since that powerful and successful independent competitors of the Harvester Company contest the field with it, and that in their presence it cannot and does not control or dictate the prices of the harvesting machines and their appurtenances which it and its competitors make and sell, that the prices of its machines and appurtenances to the dealers, and to the farmers who use them, in proportion to their costs, have decreased and are low. The purpose of preventing undue restraint of trade is to prevent unreasonably high prices to the purchasers and users of the articles traded in. The evidence in this case satisfies us that these objects have been successfully attained under the decree of November 2, 1918, the defendant's compliance with its requirements, and their conduct of their interstate commerce in harvesting machines and their appurtenances since the rendition of that decree." From these conclusions the third judge dissented, upon the ground that the evidence convinced him that the decree of 1918 had entirely failed to restore genuine competitive conditions; that the International Company had such advantages in resources, organization, selling mediums, production costs, manufacture of raw material, and volume and spread of business, as to be able completely to dominate the trade in harvesting machines; and that it did so control and dominate by

regulating prices, fixing the prices for its own machines,
by which the other manufacturers were prudently gov-
erned.   10 F. (2d) 827.   A decree was thereupon entered
dismissing the supplemental petition.

It is clear that the charges of the supplemental petition
relate solely to the interstate trade in harvesting ma-
chines, and that no issue is involved as to the other lines
of agricultural implements.   As to this the parties agree;
the Government specifically stating in its brief that this
" proceeding has to do only with an unlawful combina-
tion in harvesting machines."

The basic contention of the Government here is that
the declared purpose of the decree of 1918 was to restore
competitive conditions in the harvesting machine in-
dustry substantially as they had existed in 1902 before
the International Company was formed by the combina-
tion of the five original companies, that is, to so increase
the amount of competition and the number of competi-
tors as to restore, in a " quantitative " sense, " the free
and open competition which existed when the combina-
tion was formed "; and that therefore the sole test to be
applied in determining whether the decree has accom-
plished its purpose, is whether it " has had the effect
actually to restore in the harvesting machine industry
the competitive conditions which obtained prior to 1902."
We cannot sustain this contention.   This is entirely in-
consistent with the purpose of the consent decree, both as
appears from its terms and as it was apparently construed
by the District Court itself.   Its plain and evident pur-
pose was to substitute for the requirement in the previous
decrees that the International Company be divided into
separate and distinct corporations, the requirements that,
in order to establish " competitive conditions " bringing
about " a situation in harmony with law," the Interna-
tional Company should limit its sales agency in any town
or city to a single representative, and should sell three of

its harvesting machine lines to independent manufacturers of agricultural implements; and to give the United States the right to further relief only " in the event " that within eighteen months after the termination of the war such competitive conditions had not been established. And a construction of this decree by which, although its requirements have been fully complied with and lawful competitive conditions established, the United States would nevertheless be entitled to further relief by the division of the International Company into separate and distinct corporations for the purpose of restoring the actual competitive conditions that had existed sixteen years before the entry of the consent decree, would plainly be repugnant to the agreement approved by the court and embodied in the decree, which has become binding upon all parties, and upon which the International Company has, in the exercise of good faith, been entitled to rely.

In support of its alternative contention that competitive conditions have not been established bringing about a situation in harmony with law, the Government relies in large measure upon various statements and tabulations contained in the report of the Federal Trade Commission, which was introduced in evidence over the objection of the International Company. But it is entirely plain that to treat the statements in this report—based upon an *ex parte* investigation and formulated in the manner hereinabove set forth—as constituting in themselves substantive evidence upon the questions of fact here involved, violates the fundamental rules of evidence entitling the parties to a trial of issues of fact, not upon hearsay, but upon the testimony of persons having first hand knowledge of the facts, who are produced as witnesses and are subject to the test of cross-examination. And no support for the Government's contention in this respect is afforded by *Chicago Board of Trade* v. *Olsen,*

262 U. S. 1, 13, 37, in which the reference to statements that had been made by the Federal Trade Commission in a report to the President prior to the passage of the Act of Congress whose constitutional validity was involved, was solely as an aid in determining whether this Court was warranted in rejecting as unreasonable a finding that had been made by Congress as to the necessity for the Act.

Without entering into a detailed statement of the evidence—which is so voluminous as to render this impracticable—we find, from the greater weight of the competent testimony, that competitive conditions in the trade in harvesting machines have been established in compliance with the requirements of the consent decree.

In the course of a general development that had taken place in the agricultural industry since 1902, the International Company and many of its principal competitors had extended their lines from implements used in particular seasons, such as harvesting machines, plows and seeders, and had become in 1918, when the consent decree was entered, " long-line " year-round companies, manufacturing and selling full lines of agricultural implements. This had led to cheaper production and distribution; and, the sale of one line helping to sell the others, had brought about a change in competitive conditions affecting generally all their lines. In distributing their products they had also generally adopted the plan of selling their implements to local retail dealers, who resold them to farmers; and these dealers had become, through their personal efficiency and the good will and the friendly relations which they had established with the farmers, factors of prime importance in distributing the implements of the different companies. Prior to 1912 the International Company had also adopted the general policy, when there was more than one implement dealer in any town, of distributing its various lines, especially its Mc-

Cormick and Deering harvesting machines, among different dealers; and by means of " exclusive " contracts made with such dealers, its competitors were frequently prevented from acquiring any adequate retail outlet for their implements.   This was one of the practices which the Government had assailed in its original petition.   Furthermore, as the International Company—having five different lines of harvesting machines, which were necessarily somewhat in competition among themselves—had laid chief stress upon its McCormick and Deering lines, the sales of its Champion, Osborne and Milwaukee lines, which were frequently combined in the hands of one dealer, had proportionately decreased; so that these three lines furnished in 1918 a comparatively small part of its harvesting machine business.   This, however, was by no means negligible; and these three lines, which had been improved and kept up to date, still retained a well established reputation and a capacity for effective development.

In this situation the consent decree provided, as the means of establishing the competitive conditions which it sought to bring about, that the International Company should be limited to one sales representative in any town or city, and should sell its Champion, Osborne and Milwaukee harvesting lines to independent manufacturers of agricultural implements.

The International Company complied immediately with the single-dealer requirement in clause (a) of the consent decree.   This has caused a drastic limitation upon its method of distribution, to which none of its competitors have been subjected.   By such compliance it lost the services of almost 5,000 dealers, to whom it had sold in the preceding year implements to the amount of more than $17,000,000.   Many of these were taken over by its competitors, who acquired the benefit of their experience, good will and standing among the farmers.   It was also compelled to place its McCormick and Deering harvest-

55514°—28——45

ing lines, which usually had been handled by two dealers, with one of these dealers, who had developed a business in only one of them and was placed at a great disadvantage in handling them together; a difficulty which it has sought to overcome as far as possible by combining its McCormick and Deering lines into a new harvesting line that it has been attempting to introduce in the American market in place of the two separate lines. Further, being limited to one dealer in a town, and having its own tractor to sell in competition with the Fordson tractor, it has not been in a position to place its implements with Ford dealers, who have been available to its competitors as new and favorable outlets for their implements. And, in general, it clearly appears that the single-dealer limitation in the consent decree has greatly enlarged the field of activity of its competitors, and has proved to be, as had been anticipated, an effective means of providing competitive conditions.[6]

The International Company also complied with the requirements of clauses (b), (c) and (d) of the consent decree by selling its Champion, Osborne and Milwaukee harvesting lines to independent manufacturers of agricultural implements.[7]

---

[6] Thus, the Vice President and sales manager of Deere & Co., a leading competitor, testified: "After the decree by which the Harvester Company was prevented from having more than one dealer in a town, a great many dealers who had formerly sold Deere plows and McCormick or Deering harvesters, and to whom we had been unable to sell our harvester line, took on the John Deere harvester line."—"my idea is that whoever made the provision that the Harvester Company should confine its operations to one dealer in a town struck the crux of the whole situation."—"we know positively that with the Harvester Company confined to one dealer in a town we can compete with them."

[7] The cause of the delay in selling the Milwaukee line is fully explained in the testimony; and the Government makes no complaint in regard thereto.

The purchasers—B. F. Avery & Son, the Emerson-Brantingham Company, and the Moline Plow Company—are old-established and well-known companies, and among the largest manufacturers of implements in the United States. The acquisition of these established lines of harvesting machinery, filling out and strengthening their other implement lines, has greatly increased their competitive strength as long-line companies. And although there was from 1921 to 1923 a period of great depression in the agricultural implement industry, corresponding to the general depression in agricultural conditions, which made it difficult to launch new lines and develop new business, the officers of each of these companies testified as to their entire satisfaction with their new lines, the resulting increase in their competitive ability, and their confidence that with the resumption of better conditions in the industry they would be able to compete energetically and successfully with the International Company in the harvesting machine business. And we cannot doubt, upon the entire evidence, that the provision of the consent decree by which these three established harvesting lines were taken away from the International Company, in whose hands they had not been developed, and transferred to the purchasing companies, whose long lines were filled out and strengthened, has constituted and will constitute in progressive degree, as the agricultural depression ceases, an effective means of increasing the competition in harvesting machinery as contemplated by that decree.

It does not appear that since the entry of the consent decree the International Company has used its capital and resources—which, although much larger than those of any single competitor, are but little larger than the aggregate capital and resources of all its competitors, and are in large part employed in its foreign trade—its subsidiary companies or incidental advantages, for the pur-

pose or with the effect of restraining and suppressing the interstate trade in harvesting machinery; that it has at any time reduced the prices of harvesting machines below cost, for the purpose of driving out its competitors; or that it has at any time controlled and dominated the trade in harvesting machinery by the regulation of prices. It is true that in 1921 and 1922, the period of acute depression in the agricultural implement industry—due chiefly to the depressed agricultural conditions and the diminished purchasing power of the farmers—not only the International Company but its competitors, in a movement initiated by the leading manufacturer of plows, for the purpose primarily of disposing of the surplus stocks which they had accumulated during the war period under high cost conditions, and as a necessary measure of self-protection, made generally material reductions in the prices of harvesting machines and other implements. But the International Company did not at any time reduce its prices below replacement cost; and its reduction in prices was not intended to eliminate competition and has not had that effect. It has not, either during those two years or since, attempted to dominate or in fact controlled or dominated the harvesting machinery industry by the compulsory regulation of prices. The most that can be said as to this, is that many of its competitors have been accustomed, independently and as a matter of business expediency, to follow approximately the prices at which it has sold its harvesting machines; but one of its competitors has habitually sold its machines at somewhat higher prices. The law, however, does not make the mere size of a corporation, however impressive, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its power. *United States* v. *Steel Corporation*, 251 U. S. 417, 451. And the fact that competitors may see proper, in the exercise of their own judg-

ment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination. *United States* v. *Steel Corporation, supra,* 448. And see *Cement Mfg. Protective Assoc'n* v. *United States,* 268 U. S. 588, 606.

We further find that while several of the competitors of the International Company in harvesting machines have retired from business since 1911, some during the period of depression commencing in 1921, these retirements were not due to inability to compete with the International Company, but to other causes for which it was in no way responsible; that the place of these retiring competitors has been taken by other and stronger competitors; and that in 1923 it not only had as many competitors in harvesting machines as in 1911, but competitors of greater strength and competitive efficiency.

We also find that the International Company's percentage of the interstate trade in harvesting machinery is not shown to have increased since 1918, as the Government alleged; but, on the contrary, appears to have already decreased. The evidence does not show with any definiteness the percentage of the International Company's trade in such machinery in 1918. This, as alleged in the supplemental petition, had been approximately 77 per cent. in 1911, the year before the original petition was filed. And the Government's own tabulations show that while in 1919, the year after the consent decree was entered, the International Company sold 66.6 per cent. of all the harvesting machines sold in the United States, in 1923 its percentage was only 64.1 per cent. We need not determine the disputed question whether, as the International Company contends, there had been in fact a larger decrease.

And, finally, the testimony, practically uncontradicted, of a great number of witnesses, including officers of competitive companies, competitive retail dealers who had

handled the International Company's lines before the single-dealer requirement was put into effect, and the officers of farmers associations, leaves no room to doubt that since the entry of the decree of 1918, there had been established, and then existed, a free, untrammeled, keen and effective competition in harvesting machinery that was in no wise restrained or suppressed by the International Company.

We conclude that not only has the International Company complied with the specific requirements of the consent decree, but that competitive conditions have been established in the interstate trade in harvesting machinery bringing about "a situation in harmony with law." The decree of the District Court dismissing the supplemental petition, is therefore

*Affirmed.*

Mr. Justice McReynolds, Mr. Justice Brandeis, and Mr. Justice Stone took no part in the consideration or determination of this cause.