**UNITED STATES of America,** Plaintiff,

v.

**NATIONAL LEAD COMPANY,** Titan **Company, Inc., E. I. Du Pont De Nemours and Company, Defendants.**

United States District Court
S. D. New York.
Jan. 9, 1956.

**590**

Paul W. Williams, U. S. Atty., New York City, Herbert Brownell, Jr., Atty. Gen., Stanley N. Barnes, Chief, Antitrust Division, Department of Justice, Washington, D. C., Richard B. O'Donnell, Chief, Antitrust Division, New York City, Max Freeman, Washington, D. C., for the United States.

Milton Handler, New York City, for defendant National Lead Co.

SUGARMAN, District Judge.

The defendant National Lead Company moves "for an order construing the Final Decree herein, dated October 11, 1945, as not prohibiting" an agreement proposed to be made between National Lead Company and Fabriken Bayer Aktiengesellschaft, hereafter called "Bayer".

The decree made by Judge Rifkind [1] and affirmed by the Supreme Court [2] was the culmination of the trial of an action brought by the United States against movant, National Lead Company, Titan Company, Inc. and E. I. duPont de Nemours and Company, Inc., to enjoin the defendants from continuing violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 2, and for ancillary remedies.

The defendants were found by the trial court "to have been engaged in a combination in restraint of trade and commerce in titanium pigments among the several states of the United States and of foreign nations * * *". The court also found "that the defendants have been and now are parties to contracts, agreements, and understandings in restraint of such trade and commerce in violation of Section 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1 * *".

Jurisdiction of the court is claimed by movant to rest upon the final paragraph of the decree which provides:

"13. Jurisdiction of this cause, and of the parties hereto, is retained by the Court for the purpose of enabling any of the parties to this decree, or any other person or corporation that may hereafter become bound, in whole or in part, thereby to apply to the Court at any time for such further orders, modifications, vacations or directions as may be necessary or appropriate (1) for the construction or carrying out of this decree, and (2) for the enforcement of compliance therewith and the punishment of violations thereof.".

In support of its motion, National Lead shows that it produces and sells

1. United States v. National Lead Company, D.C., 63 F.Supp. 513, 532.

2. United States v. National Lead Company, 332 U.S. 319, 67 S.Ct. 1634, 91 L. Ed. 2077.

titanium pigments in the United States and abroad. By paragraph 6 of the 1945 decree, movant and the co-defendants were enjoined "(a) from entering into, adhering to, maintaining or furthering, directly or indirectly, or claiming any rights under any contract, agreement, understanding, plan or program among themselves, the co-conspirators, or with any other person, partnership or corporation, which has as its purpose or effect the continuing or renewing of any of the agreements listed in paragraph 5 hereof". The court by paragraph 5 of the decree adjudged certain agreements to be unlawful and restrained the defendants from further performance thereof and of any agreements amendatory thereof or supplemental thereto. Other provisions made to effectuate the decree are not here directly relevant except so much of paragraph 8 which required movant within one year to present a plan whereby it would acquire all of the stock of Titangesellschaft m.b.H. (TG) or divest itself of any interest therein. National Lead in compliance with this proviso has acquired the entire ownership of TG.

TG is a German corporation and a producer of titanium pigments. It was established by National Lead and I.G. Farbenindustrie A.G. (I.G.) [3] pursuant to agreements which bound the parties to the scheme or plan found to be unlawful and in violation of Section 1 of the Sherman Act.

Movant claims that TG's potential for expansion to meet the current worldwide demand for its product has been fully exploited and new facilities for production of titanium pigments in Germany are required to satisfy the pressing demands of the market.

For economic and financial reasons movant proposes to enter into an agreement with Bayer for the creation of such expanded facilities.

In barest outline, the proposal looks toward the exploitation of Bayer's existing site, its raw material, water supply, shipping facilities, trained personnel and other assets coupled with National Lead's patents, technical information and capital. National Lead and Bayer propose the formation of an as yet unnamed "New Company" under their joint control and ownership at Krefeld-Uerdingen in the Federal Republic of Germany.

The draft of the proposed agreement refers to the terms of the final decree in this action and in effect National Lead and Bayer agree to abide by the terms thereof.

In opposition to the motion, the plaintiff United States urges that, against the background of the main action, the antitrust violations therein found and the final decree, the proposed agreement would be violative of the spirit if not the letter of Judge Rifkind's decree and is prohibited thereby. This contention is stressed regardless of the lawfulness of the proposal under the antitrust laws generally.

The United States points to the fact that Bayer is the successor to I.G. at least in respect of the subject matter of the proposed agreement between National Lead and Bayer, viz., production and distribution of titanium pigments.

In 1925, Bayer, formerly an independent company, merged into the I.G. entity. After the defeat of Nazi Germany the Allied High Commission for Germany ordered the dispersion of the ownership and control of I.G. and the extinguishment of its juristic personality. The assets of I.G. were distributed among twelve companies to promote competition in the German chemical and related industries. One of these twelve companies was and is Bayer, movant's proposed partner in the new venture.

Accordingly, the government urges that the relief sought by plaintiff is in effect a step toward revival of the practices condemned by this court by the decree of October 11, 1945, arguing that Bayer's ancestry conclusively bars it from entering into the proposed contract under the final decree. Thus National Lead contends that the agreement

---

3. Found by Judge Rifkind to be a co-conspirator in the main action.

springs from purely valid and legitimate business reasons having "neither the purpose nor effect, directly or indirectly, of entering into, continuing or renewing any agreements, acts or practices forbidden by the decree", whereas the Government urges that National Lead, by joining Bayer in forming the "New Company", would (a) flaunt the decree of this court by realigning itself with the successor to I.G. from which National Lead was ordered divorced by the decree, or (b) violate the antitrust laws *de novo*, or (c) do both. Which may be right cannot be determined on the papers before the court. But even if it could, the motion to *construe* the decree would nevertheless have to be denied for lack of jurisdiction, a matter which both parties assumed to exist but which the court finds lacking.

A study of the antitrust cases *construing* decrees containing reservations of jurisdiction such as is found in the instant action shows that such authority is retained (1) to assure that the decree will be effectuated in the sense that competition be restored in the commerce or trade affected by the violations, by the remedial means adopted by the court [4] and (2) to reserve to the court the power to enforce its decree through contempt proceedings.

There appears to be no question that the provisions of the decree requiring affirmative remedial action on the part of National Lead and the other defendants have been fully complied with. So much of the decree as forbids conduct directed toward rejuvenation of the unlawful restraints of trade and commerce practiced by the defendants have so far been obeyed by the defendants including National Lead.

Ten years have elapsed since Judge Rifkind shaped the decree of this court to restore intranational and international competition in titanium pigments insofar as was then possible to the then existing industry which was characterized by the Supreme Court as a "vigorous, comparatively young, but comparatively large, world-wide industry".[5]

The court is aware of the far-reaching changes in the world economy which have taken place in that ten-year period—witness the destruction of the I.G. complex.

■ The violation of the Sherman Act was found in the main action in the patent pooling and in the related agreements restraining interstate and foreign commerce.[6] The decree has been effectuated and thus a construction proceeding is inappropriate to give National Lead the relief it herein seeks. The decree, insofar as what it sought to and did accomplish, needs no construction; the parties understand it fully as is apparent from their respective positions taken in this proceeding. Should the court undertake to construe the decree and on its construction thereof to rule on the merits of the instant application, it would be giving a merely advisory opinion on a *res nova*.

Movant is not here seeking a modification of the decree on any claim of undue restriction of its right to contract.[7] It claims rather that proposed activity is not within the purview of the decree. The power of the court to examine in a *construction proceeding* new ventures *proposed to be undertaken* by a defendant in this case has long since expired, at least as long ago as it could be said that the decree had been made effective in accomplishing the effects sought by plaintiff in its complaint.[8]

4. See United States v. U. S. Gypsum Co., 340 U.S. 76, 88, 89, 71 S.Ct. 160, 95 L. Ed. 89; United States v. International Harvester Co., 274 U.S. 693, 703, 704, 47 S.Ct. 748, 71 L.Ed. 1302; United States v. Imperial Chemical Industries, D.C.S.D.N.Y., 105 F.Supp. 215, 220.

5. United States v. National Lead Company, 332 U.S. 319, 347, 67 S.Ct. 1634, 1647.

6. United States v. National Lead Company, 332 U.S. 319, 347, 67 S.Ct. 1634, 91 L.Ed. 2077.

7. Cf. United States v. National Lead Company, 332 U.S. 319, 363, 67 S.Ct. 1634.

8. Cf. United States v. Lake Shore & M. S. Ry. Co., D.C., 281 F. 1007, 1011; United States v. Lake Shore & M. S.

■■ Of course, the court retains jurisdiction indefinitely to compel compliance with its decree on a proper affirmative showing by plaintiff that the defendants or any of them have contemptuously violated the decree. Similarly the court has jurisdiction to take further action upon a decree to make its enforcement conform to conditions in the exercise of the usual powers of a court of equity.[9] But the instant application is neither of these.

Movant with good cause is apprehensive that the execution of its proposed agreement with Bayer will precipitate a proceeding to punish it for contempt. In view of this, it is not free to go on with its plans (which involve an expenditure by it of between 4 and 5 million dollars) without suffering the consequences if it should eventuate that it is in error in its belief that the formation of the "New Company" will not violate the decree. But in this regard movant is in no different position from any other entrepreneur who undertakes a venture that may ultimately be held to flaunt the antitrust laws.[10] By the event of having once been held to have participated in an unlawful combine, now long since dissolved by compliance with the decree, it cannot, any more than one not thus situated, procure an advisory opinion from the court on its proposed venture with Bayer.

Solely for lack of jurisdiction to entertain the instant motion for a *construction* of the decree herein, it is denied.

It is so ordered.

Ry. Co., D.C., 5 F.2d 240; United States v. E. I. DuPont de Nemours Co., D.C., 273 F. 869, 872.

9. United States v. United States Steel Corp., 251 U.S. 417, 452, 40 S.Ct. 293, 64 L.Ed. 343; Root v. Woolworth, 150 U.S. 401, 14 S.Ct. 136, 37 L.Ed. 1123; United States v. E. I. DuPont de Nemours Co., D.C., 273 F. 869, 873.

10. Report of the Attorney General's National Committee to Study the Antitrust Laws March 31, 1955 at p. 368—"The Committee recognizes that the uncertainty of antitrust's standards may plague good faith business efforts to stay within the law."