26272. BENTLEY v. ALLSTATE INSURANCE COMPANY.

UNDERCOFLER, Justice. The Court of Appeals held the Insurance Commissioner erred in disapproving Allstate Insurance Company's 1969 homeowners' insurance premium rates. *Allstate Ins. Co. v. Bentley*, 122 Ga. App. 738 (178 SE2d 700). We granted certiorari. *Held:*

1. The Georgia Insurance Commissioner may disapprove an insurance rate as excessive when "(1) such rate is unreasonably high for the insurance provided and (2) a reasonable degree of competition does not exist in the area with respect to the classifica-

tion to which such rate is applicable." Ga. L. 1967, pp. 684, 690 (*Code Ann.* § 56-507 (a)). In our opinion these provisions are conjunctive. The Commissioner must find both conditions to exist in order to disapprove rates as excessive. To hold otherwise renders part "(2)" of this section meaningless.

2. Allstate contends that the Insurance Commissioner was not authorized to disapprove its homeowners' insurance rates as excessive because, as provided in *Code Ann.* § 56-507 (a), a reasonable degree of competition exists in the area. It points out that 210 companies compete vigorously for this business. It shows that although a majority of the companies use rates established by "rating bureaus," approximately 30% of the companies deviate therefrom. It further shows its rates are 15% below those established by the "rating bureaus."

"The business of insurance is one so clothed with a public interest, affecting the community at large, as to render it peculiarly subject to proper governmental regulation." *Cooper Co. of Gainesville v. State,* 187 Ga. 497, 500 (1 SE2d 436). One of the primary purposes of such regulation is to make certain that insurance rates are not excessive. To the same effect is Georgia's policy of encouraging competition among insurers. However, such policy does not restrict affirmative action to protect the public interest. Ga. L. 1967, pp. 684, 687 (*Code Ann.* § 56-501). The provision of the Act prohibiting the Insurance Commissioner from disapproving a rate as excessive when a reasonable degree of competition exists is directed to the sufficiency of the competition to keep rates at a fair level. The question is not whether a particular insurer is competing or whether there is some competition in the area. The question is whether the competition in the industry is vigorous enough to assure that rates are not excessive.

The evidence shows that competition in homeowners' insurance in Georgia is based primarily on two factors, price and service. The variations in the policy forms are not shown to be significant. There is testimony that of the two factors, price is the more important.

With respect to service, there is no question that the companies compete vigorously. There are hundreds of agents and salesmen

in this State selling homeowners' insurance and striving to render better service than their competitors.

With respect to price, the evidence shows that when the "rating bureaus" established rate increases in 1969 approximately 90% of the companies, including Allstate, writing approximately 90% of the homowners' insurance increased their rates in the same percentage. We think this is ample evidence to support the Commissioner's findings that a reasonable degree of competition in pricing did not exist. The fact that the rates may have been competitive prior to the rate increases has no bearing on this conclusion. When 90% of the companies adopted the same percentage of rate increases, it cannot be said that the provision of the statute encouraging competition was met. On the contrary, it appears that the "reasonable degree of competition" which was intended to promote the establishment of premium rates at a reasonable level was lacking. By "floating" with the bureau rates the large majority of the industry indicated a disposition not to compete in establishing new higher prices.

3. Allstate further contends, as is also provided in *Code Ann.* § 56-507 (a), that its rates are not unreasonably high for the insurance provided. It points out that its rates are 15% below the rates of a majority of the other companies.

Insurance is a plan for distributing individual losses. Ga. L. 1960, pp. 289, 293 (*Code Ann.* § 56-102). The insurance company is an organization for the distribution of such losses. The public is primarily and foremost concerned with the solvency of the company. However, the public interest also demands that the operating costs and profits shall not be unreasonably high. *Code Ann.* § 56-507 (a).

The Insurance Commissioner is charged with the responsibility of protecting the public from excessive insurance rates.

The guide lines for making such a determination have been established by the Georgia General Assembly. As provided in *Code Ann.* § 56-507 (b): "Consideration shall be given, to the extent applicable, to past and prospective loss experience within and outside this State, to conflagration and catastrophe hazards, to a reasonable margin for underwriting profit and contingencies, to past and prospective expenses both country-wide and those

specially applicable to this State, and to all other factors, including judgment factors, deemed relevant within and outside this State; and in the case of fire insurance rates, consideration may be given to the experience of the fire insurance business during the most recent five-year period for which such experience is available. Consideration may also be given in the making and use of rates to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers . . . (c) The systems of expenses provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the operating methods of any such insurer or group with respect to any kind of insurance, or with respect to any subdivision or combination thereof."

In our opinion this calls for an individual examination of each company's experience and manner of operation. The bureaus' rates are not a protective umbrella. *Code Ann.* § 56-524. The fact that Allstate's rate may be less than the rate for the majority of the companies does not require a conclusion that the rate is not excessive. Many factors must be taken into consideration as set out in *Code Ann.* § 56-507 (b, c).

The record here shows that Allstate writes 5% of the homeowners' insurance business in Georgia and is the second largest company in this field. In the last 5 years its business has more than doubled. From 1960 to 1968 its premium volume has increased 500%. In the five years preceding the 1969 rate increase it operated at an average expense ratio of 25.4% as compared with the rating bureaus' average of 34%. Its average profit during these five years was 9.9% compared to the generally accepted industry rate of 5% profit plus 1% for contingencies. At the same time its average loss ratio was 4.6% higher than the rating bureaus' standard of 60%. The efficiency of Allstate's operation and the appeal of its lower premiums is apparent. So far as the record discloses its reduced expense factor even when offset by high loss ratio has rewarded it with profits well above average. There is nothing in the record to indicate a change from its past experience other than the rating bureaus' increase and some evidence of an excessive loss ratio for the

first six months of 1969 which the Commissioner was authorized to find was inconclusive.

In our opinion there was substantial evidence to support the Insurance Commissioner's finding that Allstate's June 16, 1969 homeowners' rate increases of 13.2% for classes 1, 2 and 3; 10% for class 4; and 25% for class 5 were excessive. *Code Ann.* § 56-227 (c).

4. Unfair discrimination arises when like policyholders are treated differently. This principle has no application to whether rate structures are excessive as here. *Code Ann.* § 56-507 (d).

5. Divisions 3, 4, 5 (a), (b) and 7 (a) of the Court of Appeals opinion are erroneous. Division 6 is affirmed not for the reason given by the Court of Appeals but upon Division 4 of this opinion.

*Judgment reversed in part; affirmed in part. All the Justices concur, except Almand, C. J., Felton, and Hawes, JJ., who dissent.*

ARGUED MARCH 9, 1971—DECIDED MAY 20, 1971—

REHEARING DENIED JUNE 17, 1971.

*Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Robert J. Castellani, Assistant Attorney General,* for appellant.

*Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Devereaux F. McClatchey, Donald F. Schaffer, Troy W. Cox,* for appellee.

*Alston, Miller & Gaines, Francis Shackleford, F. Dean Copeland, Whelchel, Dunlap & Gignilliat, James A. Dunlap, Weymon H. Forrester,* amicus curiae.

FELTON, Justice, dissenting in part from the opinion, and dissenting from the judgment.

1. I concur in Division 1 of the majority opinion and in the part of Division 4 which states that "unfair discrimination arises when like policyholders are treated differently" because there is no charge or evidence in this case that any policyholders were treated differently. The Commissioner was in error when he found that Allstate discriminated against all of its policyholders.

2. I dissent from Division 2 of the majority opinion for the reason that the evidence before the Commissioner demands the find-

ing based on substantial evidence that a reasonable degree of competition exists in the area. The question is whether a reasonable degree of competition exists in the area rather than, as stated by the majority, *whether the competition in the industry is vigorous enough to assure that rates are not excessive.* To do what the majority requires is out of the power of the Commissioner after he allows a certain percentage rate increase for the members of the bureaus and permits them to price insurance above or below the approved raise, because members can stifle all but a small percentage of price competition by adhering to the authorized increases. The law is reasonable. The law says "if there is a reasonable degree of competition in the area." The majority concedes that all of the Georgia companies vigorously compete with respect to service. Competition in service is competition. Some companies evidently succeed in getting business by superior and efficient service though their prices are higher. This does not mean that the price is excessive for the coverage provided or that there is not a reasonable amount of competition. But there is a reasonable amount of competition as to price alone. This conclusion is abundantly supported by the record, which shows: (1) that there are 210 companies licensed to do business in Georgia—making available to a Georgia citizen a greater number of sellers when he seeks homeowners' insurance than when he shops for most other articles or services in his business community; (2) no company has more than a relatively small portion of the market, and the companies' market positions have been constantly changing; (3) over half of the 210 companies (109, according to the Commissioner's findings) have on file variations of forms and rates for homeowners' insurance; (4) non-bureau companies sell at as much as 30% below bureau rates. Even among the rating bureau companies themselves, 49 sell at rates from 10% to 20% below the bureau rates. (5) Approximately 30% of the homeowners' insurance in Georgia is sold at premium rates lower than bureau rates; and (6) there is competition in forms, services and types of distribution and merchandising systems, and in net costs considering dividends.

"The bureau rate level adjustments which were effectuated in May, 1969, were reflective of changes in the aggregate homeown-

ers' loss experience of the industry in Georgia. Those rate adjustments were not challenged by the Commissioner and must therefore be presumed to have been lawful. For members and subscribers of the bureau, such percentage rate adjustment automatically applied to their rates unless they elected to deviate from it. Since the law forbids agreements to adhere, each bureau company may exercise its individual judgment whether or not to adhere to a given rate or rate change. The question then follows: Was it anti-competitive for other insurers in Georgia, including Allstate, to adopt or accept, in accordance with their individual judgment, comparable adjustments of their homeowner rate levels in anticipation of comparable prospective increases in their losses? We believe there is no logic or precedent for a holding to that effect.

"Every bit as much variation in the prices, products, services and systems available to purchasers of homeowners' insurance in Georgia existed *after* these adjustments (both those of the bureau companies and of Allstate) occurred as existed before. Indeed, the competitive indicia were made even stronger by reason of the fact that the dollar spreads in prices between the bureau rates on the one hand and the rates of non-bureau companies and deviating bureau companies on the other were widened.

"If such economically sound action as occurred here is repugnant to the existence of reasonable competition, then all entrepreneurs in all walks of business who in good faith respond more or less uniformly to indicated changes in common cost ingredients in their industry should be subjected to antitrust sanctions, or to comprehensive governmental price regulation, or both. That this has not happened is proof positive that such action is not anti-competitive, but is a valid part of the economic facts of life in all walks of competitive enterprise. In United States v. International Harvester Co., 274 U. S. 693, 708-9 (1927), the U. S. Supreme Court stated that '. . . the fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.'

"The real thrust of the Commissioner's attempted construction of § 56-507 (a) is that all or a substantial segment of the compa-

nies in Georgia must avoid adjusting their respective rate levels by the percentage indicated by the aggregate loss experience—for *no other reason* than to create the appearance of 'competition' as the Commissioner conceives it. To give effect to his theory would mean that where, for example, the rating bureau files for a 10% rate level increase based on changes in the aggregate loss experience, a substantial number of the companies both bureau and non-bureau would be obliged, in order to satisfy the Commissioner's 'competition' test, either to forego rate adjustments or to file smaller or larger percentage adjustments than 10%—even though their judgment tells them that the aggregate loss experience is the best barometer of their own future loss trends. Such an eventuality violates common sense, and could well produce unsound operations and destroy reasonable competition. No such self-defeating construction of the Georgia competitive rating law could ever have been intended by the General Assembly, and the Court of Appeals properly rejected it." (Quotes from brief of National Association of Independent Insurers.) If reasonable competition did not exist under the evidence in this case the definition of competition should be radically changed.

The Commissioner cannot repudiate his own action and rule which was designed to stimulate competition as to price, and this is true regardless of whether some or all of the bureau companies used the licensed rates by a percentage variation *up* or *down*. And "what is good for the goose is good for the gander." It is perfectly all right for the bureau companies to vary rates percentage-wise—that stimulates competition—but when Allstate does identically the same thing it does not stimulate competition price-wise, according to the Commissioner's findings. The rule promulgated by the Commissioner is as follows: "If an insurer which makes its rates, rating plans, rating systems and underwriting rules in the first instance in concert with the others through a licensed rating organization uses these rates without any variation *except a percentage variation up or down* [emphasis supplied], then it may fulfill its obligations by reporting these facts in writing to the rating division." Under the Commissioner's rulings in this case his conclusion in disapproving Allstate's homeowners' rates practically amounts to a fixing of Allstate's homeowners' rates, which the law prohibits.

3. The Court of Appeals was also right when it held that there was no substantial evidence before the Commissioner to authorize a finding that Allstate's rates for homeowners' insurance were excessive. The Commissioner has solemnly adjudicated that every bureau member who has been authorized to vary from the bureau rates, up or down, has proposed a variance based on a premium which he adjudged to be *not excessive* for the coverage provided by *not challenging such percentage raises or decreases.* This means that the Commissioner has not complied with the law as to Allstate because he has not dealt it justice with an even hand and has unconstitutionally discriminated against Allstate for the simple reason that if the premiums charged by the bureau members varying from the bureau rates are *higher* that Allstate's premiums which are *lower* than the bureau rates by a fixed percentage and lower than the rates adopted by some members it cannot be said that Allstate's homeowners' rates are excessive. Any reasoning or so-called reasoning to the contrary shows without contradiction that the conclusion holding Allstate's premiums too high is based *solely* on the fact that Allstate's *profits* are too high and such a conclusion is not authorized by law. This ought to be enough on this subject but the following quotation from Allstate's brief is deemed appropriate:

"The big point urged by the Commissioner in this case, with respect to the reasonableness of the Allstate rates, is discussed by the Court of Appeals in division 5 of its opinion. The Commissioner has undertaken to focus attention upon Code 56-507 (b). This section relates to items to which 'consideration shall be given' in fixing rates. Among the items mentioned are 'past and prospective loss experience' . . . 'a reasonable margin for underwriting profit and contingencies' . . . 'past and prospective expenses' . . . 'and all other factors, including judgment factors, deemed relevant within and outside this State. . . .' It should be borne in mind that this Code section does not relate to the standards which the Commissioner must use in judging whether to challenge a rate. Rather it relates to the rate-making process itself to be carried on by the bureaus, or by the independent companies. It should be borne in mind that out of 210 companies engaged in Georgia in the sale of homeowners' insurance policies,

200 are members of rating bureaus. These bureaus are authorized, by law, to determine, and do determine, 'bureau rates.' In establishing bureau rates, the bureaus follow the injunction of this Code section, and consider all relevant factors. The experience of all companies is considered in fixing bureau rates, including that of the few non-bureau companies (and including the experience of Allstate). If Allstate were a member of one of the bureaus, the Commissioner concededly would not have challenged its rates as being 'unreasonably high for the insurance provided,' because the Allstate rates are approximately 15% below the bureau rates. But the Commissioner has challenged the Allstate rates as being too high because Allstate ran its business efficiently enough to produce a profit for the five years examined, which is somewhat higher than that of the average bureau company. The Commissioner concedes that he has not tried to regulate the individual profits of any bureau company. And the Commissioner declined to consider the Allstate experience for the six months just preceding the adoption of the new rates, during which a loss was sustained of 123%. The Commissioner certainly did not consider the effects of run-away inflation, sky-rocketing expenses, rising claims, and the like, nor the fact that the bureau rates themselves were substantially raised just before Allstate adopted its rates.

"The Commissioner has erroneously acted as though, under the new law, he still retains a right to regulate the profits of individual companies (though he has not exercised such right in reference to the bureau companies). On the contrary, the new law depends upon competition, primarily, for reasonable rates to be offered to the public. Code Section 56-507 (b) and (d) give flexible guides 'to the extent applicable.' These sections obviously refer primarily to the rating bureaus, which establish bureau rates, and the factors listed are to be considered in budgeting, ahead of time, based upon the experience of the entire industry. They do not regulate profits of individual companies.

"The Allstate loss ratio for the five years examined was 64%, whereas the bureaus had budgeted a 60% loss ratio. It was therefore through economies of operation that Allstate achieved its underwriting profit. The law does not intend to penalize economies which benefit the public through lower prices.

"The Commissioner has made a misleading reference in his discussion of Ground III to the 'Commissioner's use of the NAIC figure of 5% profit plus 1% contingency,' which requires clarification here. The Commissioner's finding of fact in this respect was rejected by the Court of Appeals (Court of Appeals decision, division 9). Many years ago, in 1921, long before homeowners' insurance was developed, and more than forty years before the new Georgia rating law as adopted, and at a time when all companies belonged to rating bureaus, the National Association of Insurance Commissioners recommended these percentages (5% and 1%) as budget factors to be considered in adopting industry-wide rates for fire insurance. The recommendation was never intended to apply to the profits achieved by individual companies, or to any company charging less than bureau rates. It was in effect so stated in the official '1949 proceedings of the National Association of Insurance Commissioners' where, at 463, it is stated that such factors are 'for companies acting in concert', *and not for 'rate-making by individual insurers.'* The bureau companies themselves vary widely in their profit or loss experience. As stated in Crane, 'Automobile Insurance Regulation', subtitled 'Public Control of Price Competition,' p. 165: 'The profit a company makes should be no concern of the government so long as there are available in the area other companies willing and able to write the insurance at a lesser rate. It should be the responsibility of the individual insured to shop around for his insurance; if he wants to pay the highest price on the market, that should be his privilege, and likewise, if he wants to pay the lowest price. So long as several prices are available to choose from for the same type of insurance, no one is injured, and no one, least of all the government, should complain.'

"Counsel for the Commissioner states further in commenting upon his Ground III: 'To decide this question, a reviewing tribunal should first determine what is a reasonable rate. If the court will not accept the Commissioner's use of the NAIC (National Association of Insurance Commissioners) figure of 5% profit plus 1% contingency, another reasonable figure or method must be determined for the purpose of this and other cases.'

"We submit that the Commissioner's argument here, harking back to a 1921 recommendation of a voluntary body of Insurance

Commissioners, is straining to make an issue where none exists. The record shows abundantly, as already discussed, that the rating bureaus, acting as provided by law, consider the experience of all companies, and all other relevant factors, and arrive at reasonable rates for the industry, using the factors as set forth in the Code section. This process was carried out by the rating bureaus in Georgia just prior to the new Allstate rate being adopted, when the new bureau rates were put into effect. Under any view of the matter, how can the Commissioner plausibly contend that the unchallenged bureau rates, available for use by 95% of the entire industry in Georgia, can be otherwise than reasonable in amount for use by Allstate, especially when the Allstate rates are approximately 15% below the bureau rates? The Commissioner's question answers itself. The bureau rates, established for substantially the same product, are the best evidence of reasonableness, for use by Allstate. Certainly the new law is not intended to have the effect of requiring Allstate and other non-bureau companies to become members of a bureau for self-protection.

"The declared purpose of the new statute would be subverted if the Commissioner should be given authority to penalize one company because it is an independent company, and it charges a lesser rate. Also, the Commissioner should not be given an untrammeled discretion to determine what is 'reasonable for the insurance provided,' when he is clearly doing so upon arbitrary standards, seeking to control profits rather than to benefit the public. Certainly it is in the interest of the public to encourage, rather than to penalize, efficiency of operation, which brings lower prices to the public, and also reasonable profit returns. This is the meaning of the new law.

"The Commissioner's argument suggests that though Allstate has substantially the same (though somewhat broader) policy forms than bureau companies (as found by the court), there must be some other differences which would justify the Commissioner's applying some different rule to Allstate, thereby hoping to justify his arbitrary action in this case. But no such differences appear in the record, or are pointed out by the Commissioner. Companies in Georgia selling homeowners' insurance are all in one class and have previously been so dealt with by the Commissioner, so far as

the standards concerning competition and the reasonableness of their rates are concerned, and there is utterly no basis for concluding otherwise. No such basis for different treatment can be inferred, simply because the Commissioner has chosen to challenge the Allstate rates, but not the (higher) bureau rates, for the same 'insurance provided.'

"In Ground I of the petition for certiorari, the Commissioner states: '. . . Allstate was the only insurer whose rate was unreasonably high for the insurance provided.' He thus seeks to justify his failure to challenge the higher bureau rates. But as we have already shown, Allstate has been selling its product in Georgia so successfully over the years as to become the second largest seller in the State, at rates substantially below the bureau rates. We submit that the imagination is challenged to find support in the record, or elsewhere, for any such statement as is quoted just above. What could be a more outstanding example than this statement, of the arbitrariness of the Commissioner's action in singling out this one company for his attack?"

HAWES, Justice, dissenting. Justice Felton has inserted pertinent parts of briefs submitted in behalf of Allstate in support of his dissent. Although voluminous, these excerpts are necessary that future researchers on the points involved in this case might see the basis for our dissent. Be it remembered this is the first instance these statutes have been before this court for construction. I feel compelled to specially dissent when I think of the repercussions the majority's opinion could have, not only on Allstate, but on all similar businesses in this State. The majority opinion, finding the statutes not dovetailing to fit Allstate, adopted as their criterion *profit,* and I quote: "Its average profit during these five years was 9.9% compared to the generally accepted industry rate of 5% profit plus 1% for contingencies. At the same time its average loss ratio was 4.6% higher than the rating bureaus' standard of 60%. The efficiency of Allstate's operation and the appeal of its lower premiums is apparent. So far as the record discloses its reduced expense factor even when offset by high loss ratio has rewarded it with profits well above average." The above language is the most shocking reasoning of the majority's opinion. It is in this paragraph where they base their decision upon the

*profits* of Allstate. Since there is no case law to guide the majority, they took the license to philosophise and I will do likewise in this dissent.

Profit is what makes the free enterprise system work, and, certainly, I do not believe that the majority intends to destroy or hamper it. Under this system, the customer is free to buy or not to buy. Free enterprise, or capitalism, means the voluntary way, the American way of doing business. This system, based on profit, has made this nation the greatest producer of goods in the world. The system revolves around the fact that people and companies work for a profit. An international business organization drills its members in the slogan, "He profits most who serves the best." The hope for profit stimulates action. The chance to make profit is the motive, the foundation for the free enterprise system. Edison's electric light, Bell's telephone, DeForest's television and Whittle's jet engine, or any other worthwhile development comes because someone, or some company, put knowledge, skill and ingenuity together to make a profit, and the one who profits most under this system is the public—9.9% to Allstate and 15% saving to the public.

Profits cannot.be unreasonable or out of bounds, because in our system anyone can enter into competition with another, take the risks, offer his goods and services at a price that the consumer is willing to pay. This is free enterprise, free competition, with success to the best operated companies and failure to the wastrel. It is the profit of Allstate that helps its employees feel that they belong to the company; it is profit that gives retirement, makes profit sharing possible and brings dividends to its stockholders. It is my sincere opinion this system is being challenged in the majority opinion. There is no question that Allstate gives the same service and protection as other companies; there is no question that there was competition. The only complaint is that Allstate sold 15 percent cheaper than other companies and still made a larger profit.

The Insurance Commissioner's duty is to protect the public, not a bureau made up of other competing companies; he protects the public by seeing that the companies are and *remain solvent*—one cannot go broke making a profit. In the majority opinion, they

penalize an operation which admittedly has good management, apparently better standards of operation than their competitors. I am confident that if the legislature had realized that the Insurance Commissioner could regulate profit the bill would never have passed the General Assembly. I believe the original intent was to allow the companies to fluctuate prices, bringing them under the free enterprise system—not taking them out from under it. I feel the opinion of the majority gives unbridled power that no one man should have. Since he has assumed this power, he should have shown a certain degree of restraint, as the evidence in the case warranted. Remember, this case differs from those involving public utilities. These rates are set, and there is no competition.

To hold their rates are excessive because their profit is too much, particularly when they are 15 percent below the bureau's rate, is ludicrous. I cannot erase from my mind the question I asked the attorney for the Commissioner—would this case be in court if Allstate belonged to the bureau? His answer, I believe, was, "I guess not."